## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| _____ ) | |
| **CITY OF MEMPHIS** ) | |
| 125 N. Main Street, Room 336 ) | |
| Memphis, TN 38103, ) | |
| ) | |
| and ) | |
| ) | |
| **SHELBY COUNTY** ) | |
| 160 N. Main Street, Suite 660 ) | |
| Memphis, TN 38103 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| **WELLS FARGO BANK, N.A.** ) | |
| 464 California Street ) | |
| San Francisco, CA 94104, ) | |
| ) | |
| **WELLS FARGO FINANCIAL** ) | |
| **TENNESSEE, INC.** ) | |
| 800 Walnut Street ) | |
| Des Moines, IA 50309-3605, ) | |
| ) | |
| and ) | |
| ) | |
| **WELLS FARGO FINANCIAL** ) | |
| **TENNESSEE 1, LLC** ) | |
| 800 Walnut Street ) | |
| Des Moines, IA 50309-3605 ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## COMPLAINT FOR DECLARATORY AND
## INJUNCTIVE RELIEF AND DAMAGES

## NATURE OF THE ACTION

1.      This suit is brought pursuant to the Fair Housing Act of 1968, as amended,

42 U.S.C. §§ 3601 *et seq.*, by the City of Memphis ("City" or "Memphis") and Shelby

County ("County" or "Shelby County") to seek redress for the injuries caused by Defendants Wells Fargo Bank, N.A., Wells Fargo Financial Tennessee, Inc., and Wells Fargo Financial Tennessee 1, LLC's (collectively "Wells Fargo") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Memphis and Shelby County seek injunctive relief and damages for the injuries caused by foreclosures on Wells Fargo loans in their minority neighborhoods that are the result of Wells Fargo's unlawful, irresponsible, unfair, deceptive, and discriminatory lending practices.

2.      Wells Fargo is one of the largest mortgage lenders in Memphis and Shelby County.  Its market share and number of foreclosures are among the highest of any mortgage lender in Memphis and Shelby County.

3.      Since at least 2000, Wells Fargo has been engaged in a pattern or practice of targeting African-American neighborhoods in Memphis and Shelby County for deceptive, predatory or otherwise unfair lending practices.  The discriminatory targeting of such practices is known as "reverse redlining" and has repeatedly been held to violate the Fair Housing Act.

4.      Reverse redlining by Wells Fargo has caused an excessive and disproportionately high number of foreclosures in African-American neighborhoods in Memphis and Shelby County.  Wells Fargo's foreclosures are concentrated in these neighborhoods even though the bulk of its lending is in white neighborhoods.  Fully 43.2% of Wells Fargo's foreclosures are in predominantly African-American neighborhoods (more than 80% African-American), even though it makes only 15.1% of its loans in these neighborhoods.  At the same time, only 21.5% of its foreclosures are in predominantly white neighborhoods (less than 20% African-American), although the majority (59.5%) of its loans are located in these neighborhoods.

5.     Wells Fargo's foreclosure rate is significantly higher in the City's and County's minority neighborhoods.  Wells Fargo's foreclosure rate for loans in predominantly African-American neighborhoods of Shelby County is nearly eight times as high as its foreclosure rate for loans in predominantly white neighborhoods.  One out of eight Wells Fargo loans in the County's predominantly African-American neighborhoods results in foreclosure, but the same is true for only one in fifty-nine loans in its predominantly white neighborhoods.

6.     Wells Fargo's disproportionately high foreclosure rate in Memphis' and Shelby County's African-American neighborhoods is the result of reverse redlining.  Wells Fargo has been, and continues to be, engaged in a pattern or practice of unfair, deceptive and discriminatory lending activity in the City's and County's minority neighborhoods that has the effect and purpose of placing vulnerable, underserved borrowers in loans they cannot afford.  These practices maximize short-term profit to Wells Fargo without regard to the borrowers' best interest, the borrowers' ability to repay, or the financial health of underserved minority neighborhoods.  Wells Fargo averts any significant risk to itself by selling the loans on the secondary market shortly after originating them.

7.     If Wells Fargo were properly and uniformly applying responsible underwriting practices in African-American and white communities, it would have comparable foreclosure rates in both.  Wells Fargo possesses sophisticated underwriting technology and data that allow it to predict with precision the likelihood of delinquency, default or foreclosure.  The fact that Wells Fargo's foreclosure rate is so much higher in African-American neighborhoods is not the product of chance events and is fully consistent with a practice of targeting African-American neighborhoods and customers

3

for discriminatory practices and predatory pricing and products.  It is also consistent with a practice of failing to underwrite African-American borrowers properly and of putting these borrowers into loans they cannot afford in order to maximize the company's profits.

8.      Former Wells Fargo employees have explained precisely how the company has used discretion in pricing and financial incentives to encourage its employees to target African-American neighborhoods for deceptive, high priced loans that predictably result in unnecessary foreclosures.  The former employees confirm that, among other things, Wells Fargo gave loan officers broad discretion and large financial incentives to steer customers who qualified for prime and Federal Housing Administration ("FHA") mortgages into much more costly subprime products with increased interest rates, points, and fees that, in one declarant's words, put a "bounty" on African Americans targeted for subprime loans; deceived customers in order to give them subprime loans by, for example, telling them not to put any down payment on a property or not to submit full documentation for their loan, which would cause the loans to "flip" from prime to subprime; deceived African Americans about the full range of more advantageous products that were available to them and that they qualified for; drafted subprime marketing materials on the basis of race by using software to "translate" the materials into what Wells Fargo literally defined as the "language" of "African American;" referred to subprime loans located in minority communities as "ghetto loans;" and generally fostered a discriminatory culture that was tolerated by management. (These practices are described in greater detail in paragraphs 67-85 below.)

9.      Consistent with these practices, Wells Fargo's high-cost or subprime loans are disproportionately found in Memphis' and Shelby County's predominantly minority

neighborhoods, while its low-cost or prime loans are disproportionately found in the City's and County's predominantly white neighborhoods.

10.    In short, Wells Fargo makes significantly more loans in white neighborhoods, yet the number of foreclosures in minority neighborhoods is drastically and disproportionately higher.  At the same time that it is foreclosing on African-American neighborhoods at eight times the rate of white neighborhoods, it is using its underwriting expertise and technology to make unprecedented numbers of low-cost loans in white neighborhoods.

11.    Wells Fargo's discriminatory practices have inflicted significant and substantial harm in the minority neighborhoods of Memphis and Shelby County.  Wells Fargo's unnecessary foreclosures in these neighborhoods have caused direct and continuing financial harm to Memphis and Shelby County.

12.    Wells Fargo foreclosures cause homes to become vacant.  Vacancies cause, among other harms, squatters, increased risk of crime and fire, and infrastructure damage such as burst water pipes and broken windows.  Expensive responses by Memphis and Shelby County are required to address these harms at Wells Fargo foreclosure properties.  Using detailed data maintained by the City and County regarding items such as police calls, fire calls, the costs of boarding and cleaning vacant properties, and more, the financial harm caused by Defendants' discriminatory lending practices and resulting foreclosures on Wells Fargo loans can be calculated precisely.  It can also be distinguished from harm attributable to non-Wells Fargo foreclosures or other causes.

13.    Vacancies also cause significant declines in the property values of homes in close proximity to Wells Fargo foreclosure properties.  This reduces property tax

revenues collected by the City and County.  These losses can also be calculated precisely and distinguished from losses due to other causes.

14.     Absent judicial relief, the extent of the City's and County's injuries resulting from Wells Fargo's actions will continue to grow as more Wells Fargo loans move into foreclosure.

## **PARTIES**

15.     Plaintiff City of Memphis is a home rule municipal corporation pursuant to Article XI, Section 9 of the Tennessee Constitution.  Memphis is authorized to institute suit to recover damages it has suffered.  Memphis has a population of approximately 670,000 and is located in Shelby County, Tennessee.

16.     Plaintiff Shelby County is a political subdivision of the State of Tennessee, created pursuant to Article 7, Section 1 of the Tennessee Constitution, and existing by and virtue of the Charter of Shelby County.  Shelby County is authorized to institute suit to recover damages it has suffered.  Shelby County has a population of approximately 900,000.  Approximately three-quarters of Shelby County's residents live in Memphis.

17.     Defendant Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in California.  Wells Fargo Bank, N.A. maintains multiple offices in Memphis and Shelby County for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

18.     Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. that was formerly incorporated in California as a separate company and registered to do

business in the State of Tennessee under the name Wells Fargo Home Mortgage, Inc.

Wells Fargo Home Mortgage, Inc. merged into Wells Fargo Bank, N.A. on or about May

5, 2004.  Wells Fargo Bank, N.A. continues to do business under the name Wells Fargo

Home Mortgage, including in Memphis and Shelby County.

      19.     Defendant Wells Fargo Financial Tennessee, Inc. is a Tennessee

corporation.  Upon information and belief, Wells Fargo Financial Tennessee, Inc.

engages in the solicitation of applications for and origination of residential mortgage

loans in Memphis and Shelby County.

      20.     Defendant Wells Fargo Financial Tennessee 1, LLC is a Tennessee limited

liability company.  Upon information and belief, Wells Fargo Financial Tennessee 1,

LLC engages in the solicitation of applications for and origination of residential mortgage

loans in Memphis and Shelby County.

      21.     Wells Fargo has been one of the largest providers of mortgage credit to

homeowners in Memphis and Shelby County for many years.  From 2002 to 2008, Wells

Fargo made at least 1,000 mortgage loans a year to Shelby County homeowners with a

collective value of more than $2 billion.  In the same period, it made at least 400 loans a

year to Memphis homeowners with a collective value of more than $725 million.  Upon

information and belief, Wells Fargo continues to make loans in the City and County at a

comparable pace.

      22.     Each of the Defendants was and is the agent, employee, and representative

of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this

Complaint, was acting in the course and scope of its actual or apparent authority pursuant

to such agencies, or the alleged acts or omissions of each Defendant as agent were

subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting

or omitting to act as alleged in this Complaint, was acting through its employees, agents, and/or representatives, and is liable on the basis of the acts and omissions of its employees, agents, and/or representatives.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants conduct business in and are residents of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

**A.      The Foreclosure Crisis in Memphis and Shelby County**

25.     Wells Fargo's practices have contributed significantly to the severe foreclosure crisis in Memphis and Shelby County.  The number of foreclosure proceedings commenced in the County increased by 10% from 2007 to 2008, and the number of completed foreclosures increased by 27% in the same period.

26.     Foreclosures have multiple and far-reaching impacts on the places in which they occur, especially when they are concentrated in distressed neighborhoods that are already struggling with issues of economic development and poverty.  Foreclosures in these neighborhoods frequently lead to abandoned and vacant homes.  Concentrated vacancies driven by foreclosures cause neighborhoods, especially ones already struggling, to decline rapidly.  Even a notice of foreclosure standing alone, without a completed foreclosure proceeding, can cause property values to decline and residents to abandon their homes or stop maintaining them.  The United States Department of

Housing and Urban Development ("HUD") and the United States Department of the
Treasury ("Treasury") explained in a joint report on predatory subprime lending that
"foreclosures can destabilize families and entire neighborhoods" and that "[f]oreclosed
homes are often a primary source of neighborhood instability . . . ."  HUD & Treasury,
*Curbing Predatory Home Mortgage Lending* (2000) at 13, 51 (available at
http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

27.     One example of how foreclosures and consequent vacancies harm
neighborhoods is by reducing the property values of nearby homes.  In Memphis and
Shelby County, as in localities around the country, foreclosures are responsible for the
loss of hundreds of millions of dollars in the value of homes.  This, in turn, reduces the
City's and County's revenues from property taxes.  It also makes it harder for the City
and County to borrow funds because the value of the property tax base is used to qualify
for loans.

28.     Cities and counties with high rates of foreclosure, like Memphis and
Shelby County, must also spend additional funds for services related to foreclosures,
including the costs of securing vacant homes, holding administrative hearings, and
conducting other administrative and legal procedures.  The funds expended also include
the costs of providing additional police and fire protection as vacant properties become
centers of dangerous and illicit activities.

**B.      The Role of Subprime Lending**

29.     The growing crisis of foreclosures in Memphis, Shelby County, and across
the nation is due in large part to the rapid expansion of subprime lending.  Subprime
lending developed in the mid-1990s as a result of innovations in risk-based pricing and in

response to the demand for credit by borrowers who were denied prime credit by traditional lenders.

30.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit.  Individuals with blemished credit were not eligible for prime loans. Although borrowers with blemished credit might still represent a good mortgage risk at the right price, prime lending did not provide the necessary flexibility in price or loan terms to serve these borrowers.

31.     In the early 1990s, technological advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with blemished credit will successfully repay a loan.  This gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

32.     As the technology of risk-based pricing developed rapidly in the 1990s, so did the market in subprime mortgages.  Subprime loans accounted for only 10% of mortgage loans in 1998, but within five years grew to 23% of the market.  Outstanding subprime mortgage debt is well over $1 trillion today, up from $65 billion in 1995 and $332 billion in 2003.  These subprime loans have allowed millions of borrowers to obtain mortgages, at marginally increased prices, even though their credit profiles do not qualify them for lower-cost prime loans.  They have opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, subprime lending has created

opportunities for unscrupulous lenders to engage in irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, has led directly to defaults and foreclosures.

33.     Enticed by the prospect of short-term profits resulting from exorbitant origination fees, points, and related pricing schemes, many irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into loans that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because once made, the loans were sold on the secondary market.  As one report on Memphis's Hickory Hill neighborhood put it, a "new subculture" of lenders developed that is more "foreclosure-tolerant than foreclosure adverse" because the lenders do not have any long-term "skin in the game."  Phyllis G. Betts, The Brookings Institution, *Neighborhood Housing Markets and the Memphis Model* (2006) at 14 (available at http://www.brookings.edu/~/media/Files/rc/reports/2006/11communitydevelopment_betts/20061127_memphis.pdf).  In a break from the past, these lenders' profits are "less depend[e]nt on due diligence and risk avoidance than on high-volume, fee-driven lending."  *Id.*

34.     As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, abusive and predatory practices "are concentrated in the subprime mortgage market," as the federal government has found.  HUD/Treasury Report at 1.  These practices, which in recent years have become the target of prosecutors, legislators and regulators, include the following:

a.      Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

b.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing mislead borrowers into believing that there is a benefit to consolidating all of their debt into one mortgage loan, obscuring the predictable fact that that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

      c.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

      d.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, reserves, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

      e.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

      f.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

      g.      Placing borrowers in subprime loans even though they qualify for prime or FHA loans on better terms.

35.      As long as housing prices continued to rise, the deleterious effect of these practices was delayed and thus, hidden.  But the inevitable occurred when the real estate bubble burst in 2007 and home prices began to fall, and foreclosure rates began their dramatic rise.  Bent on maximizing short-term profits and protected by the ability to sell their loans on the secondary market, irresponsible subprime lenders have left countless

homeowners saddled with mortgage debts they cannot afford and no way to save their homes.

**C.       The Foreclosure Crisis Hits African-American Neighborhoods the Hardest**

36.     The impact of the foreclosure crisis is felt most acutely in minority communities.  This is because of the prevalence of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  In contrast to "redlining," which is the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area, reverse redlining involves the targeting of an area for the marketing of deceptive, predatory or otherwise deleterious lending practices because of the race or ethnicity of the area's residents.  This practice has repeatedly been held to violate the federal Fair Housing Act.  *See, e.g.*, *Barkley v. Olympia Mortgage Co.*, 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007); *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000).

37.     The HUD/Treasury Report (discussed in paragraph 26 above) found that reverse redlining in subprime mortgage lending is a major problem:  "Predatory lenders often engage in 'reverse redlining' – specifically targeting and aggressively soliciting homeowners in predominantly lower-income and minority communities . . . ." HUD/Treasury Report at 72.  "Testimony at the forums [held by the HUD/Treasury National Predatory Lending Task Force] strongly indicates that many predatory lenders may have engaged in reverse redlining, or targeting abusive practices to protected groups."  *Id.*

38.     There is a substantial body of empirical evidence that supports the HUD/Treasury finding and establishes that subprime mortgage lending and the predatory practices often associated with subprime lending are targeted at African Americans and African-American neighborhoods.

39.     The Fannie Mae Foundation found that many borrowers who qualify for prime mortgage loans are instead given subprime loans, and that the problem is particularly acute for African-American borrowers.  James H. Carr & Lopa Kolluri, Fannie Mae Foundation, *Predatory Lending: An Overview* (2001) (available at http://www.cra-nc.org/financial.pdf).  Fannie Mae stated that "research by Freddie Mac reports that as much as 35 percent of borrowers in the subprime market could qualify for prime market loans" and that "Fannie Mae estimates that number closer to 50 percent." *Id.* at 37.  Focusing on race, Fannie Mae concluded that "the level of subprime lending to black households and communities far exceeds the measured level of credit problems experienced by those households."  *Id.*

40.     A study by the National Community Reinvestment Coalition ("NCRC") reached the same conclusion.  National Community Reinvestment Coalition, *The Broken Credit System: Discrimination and Unequal Access to Affordable Loans by Race and Age – Subprime Lending in Ten Large Metropolitan Areas* (2003) (available at http://www.ncrc.org/images/stories/pdf/research/ncrcdiscrimstudy.pdf).  The NCRC studied subprime mortgage loans in metropolitan areas across the country.  *Id.* at 6, 24-25.  It combined data that lenders are required to release to the public under the federal Home Mortgage Disclosure Act ("HMDA") with credit scoring data on a census tract level that the authors obtained from one of the three major credit bureaus.  *Id.* at 19-20, 25.  (Credit scores are not released under HMDA.)  The NCRC controlled for differences

in credit scores and found a statistically significant and positive correlation between the percentage of African Americans in a census tract and the percentage of subprime loans in the tract. *Id.* at 31-34.

41.     HUD, though it did not have access to credit scores or other data about creditworthiness, studied 1998 HMDA data on almost 1 million mortgages and likewise concluded that the growth of subprime lending was disproportionately concentrated in African-American neighborhoods. HUD also found that the disparity persisted across income lines and actually increased as neighborhood income increased and stated that the problem requires "closer scrutiny." HUD, *Unequal Burden: Income and Racial Disparities in Subprime Lending in America* (2000) at 4-5 (available at http://www.huduser.org/Publications/pdf/unequal_full.pdf). HUD observed with alarm that "only one in ten families in white neighborhoods [receive subprime loans and] pay higher fees and interest rates, but *five in ten families in African-American communities are saddled with higher rates and costs.*" *Id.* at 4 (emphasis in original). Describing HUD's research in their subsequent joint report, HUD and Treasury stated that "the research consistently revealed that, controlling for income, predominantly non-white census tracts showed much higher subprime refinance penetration rates than predominantly white census tracts." HUD/Treasury Report at 105.

42.     A study of 2000 HMDA data covering every metropolitan statistical area in the country found a parallel racial disparity in the frequency of subprime loans. Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market* (2002) at vii-ix (available at http://www.knowledgeplex.org/redir.html?id=1032&url=http%3A%2F%2Fwww.knowle dgeplex.org%2Fkp%2Freport%2Freport%2Frelfiles%2Fccc_0729_risk.pdf).

43.     The studies discussed above show that African Americans and residents of African-American neighborhoods receive subprime loans at a much greater frequency than whites and residents of white neighborhoods, and that the disparity is much greater than legitimate underwriting factors can explain.

44.     The following studies provide empirical evidence that, after controlling for creditworthiness and other legitimate underwriting factors, there are likewise substantial disparities based on race in the terms and conditions of the subprime loans given to African Americans and residents of African-American neighborhoods.

45.     A study by the Center for Responsible Lending ("CRL") found racial disparities in the pricing of loans.  The study included loans made by Wells Fargo.  The study found that African Americans receive higher-priced subprime mortgage than whites who are similarly situated with respect to credit and other underwriting criteria.  Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf).  This study combined HMDA data with a proprietary database to determine whether race had a statistically significant effect on the pricing of subprime loans in 2004.  *Id.* at 3, 9.  The proprietary database covered 87% of the U.S. subprime market.  *Id.* at 9.  It included credit criteria such as the credit score and loan-to-value ratio for each loan; such data is not released under HMDA and is not publically available.  *Id.*

46.     The CRL found that, after controlling for credit and other underwriting factors, the odds were 40% to 84% higher that an African-American borrower would receive a high-cost purchase loan than a similarly-situated white borrower.  *Id.* at 16.  The

difference was statistically significant for most types of purchase loans.  *Id.*  Similarly, the study found that the odds were 4% to 62% higher that an African-American borrower would receive a high-cost refinance loan than a similarly-situated white borrower, also after controlling for credit and other underwriting factors.  *Id.* at 17.  The difference was statistically significant for refinance loans with prepayment penalties, which constituted nearly two-thirds of the refinance loans analyzed.  *Id.*

47.    Another study by the Center for Responsible Lending found that subprime borrowers in predominantly African-American and other minority neighborhoods are much more likely to be given loans with prepayment penalties than subprime borrowers in predominantly white neighborhoods who are similarly situated with respect to credit and other characteristics.  Center for Responsible Lending, *Borrowers in High Minority Areas More Likely to Receive Prepayment Penalties on Subprime Loans* (2005) (http://www.responsiblelending.org/mortgage-lending/research-analysis/rr004-PPP_Minority_Neighborhoods-0105.pdf).  The Center analyzed proprietary data from The First American Corporation on 1.8 million subprime loans originated from 2000 to mid-2004.  First American's proprietary database allowed the Center to control for a variety of underwriting factors, such as credit score, loan-to-value ratio, debt-to-income ratio, and more.  *Id.* at 5, App.-1.  The study found that "[t]he odds of borrowers receiving prepayment penalties are consistently and positively associated with minority concentration, and the differences are statistically significant."  *Id.* at 1-2.  It concluded, "[i]n the simplest terms, the odds of avoiding a prepayment penalty on a subprime loan are significantly better for borrowers who live in predominantly white neighborhoods."  *Id.* at 7.

18

48.     Another study found racial disparities with respect to requiring borrowers to pay yield spread premiums.  Howell E. Jackson & Jeremy Berry, "Kickbacks or Compensation: The Case of Yield Spread Premiums" (2002) (available at http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf).  The authors analyzed data on creditworthiness and other underwriting criteria, including credit scores and loan-to-value ratios, that was obtained in discovery in a mortgage lending lawsuit under the federal Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*.  *Id.* at 7, 122-23 & n.147.  They found that, after controlling for such criteria, African Americans (and Hispanics) paid substantially more in yield spread premiums than other borrowers, and that the disparity was statistically significant.  *Id.* at 9, 125.  Moreover, they found that for every dollar paid by borrowers in yield spread premiums, the borrowers gained only 20 to 25 cents of value.  *Id.* at 127.

**D.     Reverse Redlining is Prevalent in Memphis and Shelby County**

49.     Reverse redlining typically flourishes in cities where two conditions are met.  First, the practice afflicts cities where minorities historically have been denied access to credit and other banking services.  The legacy of historic discrimination, or redlining, often leaves the residents of minority communities without the means or resources required to identify loan products and lenders offering products with the most advantageous terms for which they might qualify.  This makes them especially vulnerable to irresponsible subprime lenders who, instead of underwriting carefully to ensure that the loans they offer are appropriate for their customers, engage in the unscrupulous lending practices described in paragraph 34 above.

50.     Second, reverse redlining arises in cities where there are racially segregated residential living patterns.  This means that the people who are most

vulnerable to abusive lending practices are geographically concentrated and therefore easily targeted by lenders.

51.     Both of these conditions are present in Memphis and Shelby County. First, Memphis' and Shelby County's minority communities historically have been victimized by traditional redlining practices that persisted for decades.

52.     Second, the City and County are highly segregated between African Americans and whites.  As the following map shows, even though Memphis is 61% African-American and 34% white, and Shelby County is 52% African-American and 45% white, many neighborhoods have a much higher concentration of one racial group or the other.



53.     A recent study of lending in Shelby County is consistent with the existence of a pattern or practice of reverse redlining by lenders providing mortgages to residents of the City.  Phyllis G. Betts, Carol Gothe & Adam Foster, Community Development Council & Center for Community Building and Neighborhood Action, *Beyond Subprime Lending* (2008) (available at http://cbana.memphis.edu/lending2006/documents/LendingSummary2006_Beyond_Subprime_Lending.pdf).  The authors analyzed 2006 HMDA data for Shelby County and found that "[b]lack borrowers are more than twice as likely to have a subprime loan as white borrowers, with disparities at all income levels." *Id.* at 6.

54.     The locations of foreclosures in Memphis and Shelby County are also consistent with the existence of a pattern or practice of reverse redlining by lenders providing mortgages to residents of the City and County.  As shown in the following map, although foreclosures have occurred in many parts of Memphis and Shelby County, they are disproportionately concentrated in the City's and County's African-American neighborhoods.  Neighborhoods like South Memphis, Binghamton, Fox Meadows/Hickory Hill, Orange Mound, North Memphis and Whitehaven, all with African-American populations above 80%, are at the center of the foreclosure crisis.  Countywide, census tracts that are above 80% African-American account for 43.3% of all filings, even though they account for only 24.4% of the owner-occupied households.  Citywide, such census tracts account for 54.7% of all filings but only 39.6% of owner-occupied households.



**Foreclosure Filings 2000 - 2008**

**Percent African American Households 2007**

Claritas Estimate By Census Block Group

| | |
|---|---|
| | 20% or Less |
| | 20.1% - 40% |
| | 40.1% - 60% |
| | 60.1% - 80% |
| | Over 80% |
| | Insufficient Data |

→ Indicates Majority African-American Neighborhood

→ Indicates Majority White Neighborhood

**D.     Wells Fargo is a Major Contributor to the Foreclosure Crisis in Memphis'
and Shelby County's African-American Neighborhoods**

55.     Wells Fargo is one of the largest mortgage lenders in Memphis and Shelby
County.  It has made at least 1,000 mortgage loans in Shelby County in each of the last
seven years (2002-2008) with a collective value of more than $2 billion, and at least 400
mortgage loans a year with a collective value of more than $725 million in the City.
Wells Fargo makes loans in both the white and African-American neighborhoods of
Memphis and Shelby County.

56.     Far from being a responsible provider of much-needed credit in minority
communities, however, Wells Fargo is one of the leading causes of the disproportionately
high rate of foreclosure in Memphis' and Shelby County's African-American
neighborhoods.  Its foreclosures since at least 2000 have been concentrated in South
Memphis, Binghamton, Fox Meadows/Hickory Hill, Orange Mound, North Memphis,
Whitehaven, and other neighborhoods with African-American populations exceeding
80%.

57.     In the City, 56.6% of Wells Fargo's foreclosures from 2005 to 2008 were
in census tracts that are predominantly African-American, but only 11.5% were in tracts
that are predominantly white.  In the County, 44.9% of Wells Fargo's foreclosures from
2005 to 2008 were in predominantly African-American census tracts but only 22.2%
were in tracts that are predominantly white.

58.     The figures are comparable for Wells Fargo's foreclosures in the City and
County from 2000 to 2004.  Half of the foreclosures in the City were in tracts that are
predominantly African-American and only 7.1% were in tracts that are predominantly
white.  In the County 37.2% of the foreclosures were in tracts that are predominantly
African-American and only 18.9% were in tracts that are predominantly white.

59.     At the same time, Wells Fargo has the third largest number of foreclosures in Shelby County of any lender from 2000 to 2008.  The following map represents the concentration of Wells Fargo's foreclosures in African-American neighborhoods.



60.     The likelihood that a Wells Fargo loan from 2000 to 2008 in a predominantly African-American neighborhood will result in foreclosure is dramatically greater than the likelihood of foreclosure for a Wells Fargo loan in a predominantly white neighborhood.  In the County, 13.3% of Wells Fargo's loans in predominantly African-American neighborhoods result in foreclosure, but the same is true for only 1.7% of its loans in neighborhoods that are predominantly white.  In the City, 13.2% of Wells Fargo's loans in predominantly African-American neighborhoods result in foreclosure, but the same is true for only 2.2% of its loans in neighborhoods that are predominantly white.  In other words, a Wells Fargo loan in a predominantly African-American neighborhood in Shelby County is almost eight times more likely to result in foreclosure as one in a predominantly white neighborhood.  In Memphis, it is six times more likely to result in foreclosure.

**E.      Wells Fargo Targets Memphis' and Shelby County's African-American Neighborhoods for Improper and Irresponsible Lending Practices**

61.     Wells Fargo's failure to underwrite loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years.  For example, its practices are the focus of a 2004 report from the Center for Responsible Lending.  The report concluded that the company's customers "too often face the loss of their home or financial ruin as a result" of its "predatory practices." Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending* (Apr. 2004) at 10 (available at http://www.responsiblelending.org/mortgage-lending/research-analysis/ip004-Wells_Fargo-0404.pdf).  The predatory practices identified in the report include charging excessive fees; charging excessively high interest rates that are not justified by borrowers' creditworthiness; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; using deceptive sales practices to

27

wrap insurance products into mortgages; convincing borrowers to refinance mortgages into new loans that only benefit Wells Fargo; deceiving borrowers into believing that they are getting fixed rate loans when they are really getting adjustable rate loans, and more.

62.      Wells Fargo's pattern or practice of failing to follow responsible underwriting practices in Memphis' and Shelby County's African-American neighborhoods is evident from the type of loans that result in foreclosure filings in those neighborhoods.  Approximately 62% of Wells Fargo's County loans that result in foreclosure, and 64% of its City loans that result in foreclosure, are fixed rate loans.  For both the City and County, this ratio is virtually the same in African-American and white neighborhoods.  This establishes that there is no legitimate reason for the stark difference in Wells Fargo's foreclosure rates by race.

63.      Unlike adjustable rate loans, where the price may fluctuate with changing market conditions, the performance of fixed rate loans is relatively easy to predict using automated underwriting models and loan performance data because monthly payments do not vary during the life of the loan.  Using these sophisticated risk assessment tools, and relying on traditional underwriting criteria such as FICO scores, debt-to-income ratios, loan-to-value ratios, and cash reserves, any lender engaged in responsible underwriting practices designed to identify qualified borrowers can predict with statistical certainty the likelihood of default and/or delinquency.  Lenders engaged in marketing fixed rate loans in a fair and responsible manner should have no difficulty sifting out unqualified borrowers, or borrowers whose loans would likely result in delinquency, default or foreclosure.

64.     Because the percentage of fixed rate loans is so high and the same in both African-American and white neighborhoods, Wells Fargo should, if it properly underwrites, have comparable foreclosure rates in both communities.  The fact that Wells Fargo's underwriting decisions result in foreclosure six to eight times more often in African-American neighborhoods than in white neighborhoods means that it is not following fair or responsible underwriting practices with respect to African-American customers.

65.     The disparate foreclosure rates are instead consistent with the type of unscrupulous subprime lending practices described in paragraph 34.  Wells Fargo engages in these and similarly inappropriate practices when making loans to African Americans and in African-American neighborhoods.  This pattern or practice of targeted activities fully explains the disparate rates of foreclosure.  The disparities are not the result of or otherwise explained by legitimate non-racial underwriting criteria.

66.     A closer look at Wells Fargo's lending practices and the characteristics of its loans in Memphis and Shelby County demonstrates that it is engaged in a pattern or practice of reverse redlining with respect to the City's African-American neighborhoods.  As described in sections E.1 through E.7 below, information from former Wells Fargo employees and examination of Wells Fargo's loans and pricing rules indicates it is engaged in unfair and discriminatory practices in Memphis' and Shelby County's African-American neighborhoods that have the effect and purpose of placing underserved borrowers in loans they cannot afford.  These practices maximize short-term profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  This targeted pattern or practice

has resulted in the disproportionately high rate of foreclosure found in Memphis' and Shelby County's African-American neighborhoods.

      **1.**      **Former Wells Fargo Employees Explain How the Company Targets African Americans in Memphis and Shelby County for Subprime Loans and Abusive Subprime Lending Practices**

      67.      Two former Wells Fargo employees, Tony Paschal and Elizabeth Jacobson, confirm that Wells Fargo's subprime loan officers engaged in a myriad of deceptive, abusive, and predatory subprime lending practices in Memphis and Shelby County.  Mr. Paschal further confirms that Wells Fargo targeted these abusive subprime practices at residents of African-American neighborhoods in Memphis and Shelby County.  This constitutes reverse redlining.

      68.      Paschal was a Wells Fargo loan officer from September 1997 to September 2007 (with a hiatus of approximately 2½ years beginning in June 1999). Paschal worked in Virginia and Maryland but his job was to solicit Wells Fargo borrowers from throughout the country to refinance their home mortgage with a prime or Federal Housing Administration ("FHA") loan.  FHA loans have interest rates that are closer to prime than subprime rates.  Paschal worked with many applicants from Memphis and Shelby County.  Paschal referred the borrowers who did not qualify for a prime or FHA loan to the Mortgage Resources division, known as "MORE."  MORE originates subprime loans exclusively and does so across the country, including in Memphis and Shelby County.  Paschal worked on the same floor of the same building as MORE employees and he communicated with them daily.

      69.      Jacobson worked for Wells Fargo as a loan officer and then as a Sales Manager from August 1998 until December 2007.  Jacobson made subprime loans exclusively and was one of Wells Fargo's top three subprime loan officers nationally year

after year, and in some years was the company's top subprime loan officer in the country. She was based in Maryland but is familiar with Wells Fargo's policies and practices nationally, including in Memphis and Shelby County.

### A. Targeting African Americans for Subprime Mortgage Loans

70.     Wells Fargo targeted African Americans in Memphis and Shelby County in different ways.  Paschal confirms that one way was to target the marketing of its subprime products to predominantly African-American zip codes in the City and County, while not targeting white zip codes.  Paschal heard employees in the MORE division, which makes subprime loans nationally, comment that white areas are not good for subprime loans.

71.     Another way in which Wells Fargo targeted African Americans was by tailoring its subprime marketing materials on the basis of race.  Wells Fargo devised software to print out subprime promotional materials in different languages, one of which it called "African American."  A computer screen shot from 2006 showing this option is attached hereto as Attachment A.  These promotional materials were available to loan officers across the country, including in Memphis and Shelby County.  Wells Fargo did not remove the African American "language" option until Tony Paschal complained.

72.     Wells Fargo's subprime loan officers in the MORE division held derogatory stereotypes of African Americans, which contributed to their targeting of African Americans in Memphis and Shelby County for subprime loans.  Paschal heard subprime loan officers from MORE describe African-American and other minority customers as "mud people" and say that "those people have bad credit" and "those people don't pay their bills."  They referred to loans in minority communities as "ghetto loans."

31

Paschal's manager, Dave Zoldak, was promoted even after Paschal complained to management about Zoldak's use of the slur "nigger."

### B.   Steering People Who Qualify for Prime Mortgages into Subprime Mortgages

73.     Jacobson and Paschal state that Wells Fargo regularly steered borrowers who qualified for prime loans into subprime loans.  Wells Fargo gave loan officers substantial financial incentives and the discretion to steer borrowers in this manner. Paschal was instructed by management to refer borrowers who could have qualified for more advantageous prime or FHA loans to the subprime unit.  He was even reprimanded for giving too many people FHA loans instead of referring them for subprime loans.

74.     One of the borrowers who Paschal was instructed to steer into a subprime loan was an African American from Memphis.  The borrower had excellent credit but had been given a subprime 2/28 adjustable rate loan by Wells Fargo two years earlier.  He wanted to refinance that loan to keep his monthly payment from suddenly rising.  He qualified for a prime fixed-rate refinance loan, but Paschal's manager instructed him to give the borrower another adjustable rate subprime loan instead.  Paschal refused and was disciplined as a result.

75.     Although Jacobson was based in Maryland, she regularly communicated with and traveled to meet with Wells Fargo employees from across the country.  She is knowledgeable about Wells Fargo's mortgage policies and practices nationally, including their application in Memphis and Shelby County.  Jacobson states that Wells Fargo created very substantial financial incentives to steer people into subprime loans.  "A reps," who made prime loans, generally made more money in referral fees by referring a person with prime credit to a subprime loan officer than by originating a prime loan. Subprime loan officers, whose pay was based on commissions and fees, likewise made

more money by originating loans with higher interest rates and fees. Paschal describes the effect of Wells Fargo's compensation system for subprime loans as putting "bounties" on minority borrowers.

76.     Wells Fargo also gave lavish gifts and trips to successful subprime loan officers, even as foreclosures increased in recent years. This was part of a culture, confirmed by Paschal and Jacobson, that focused only on making the most money possible and not on putting borrowers in loans that were appropriate for them.

77.     Loan officers were able to steer people with good credit into subprime loans because Wells Fargo gave them broad discretion. Jacobson knows from regularly communicating with Wells Fargo employees around the country that in Memphis and Shelby County, Wells Fargo's underwriting guidelines and pricing rules gave ample discretion to A reps to allow them to steer customers who qualified for prime loans into subprime loans by referring them to subprime loan officers. She confirms that the subprime loan officers then had discretion to offer the customers higher-priced products.

78.     Wells Fargo loan officers developed a multitude of unscrupulous ways to apply their discretion to get away with steering subprime loans to people who qualified for prime or FHA loans. One method was to intentionally mislead customers by, for example, giving "stated income" loans to customers who could document their income, or telling customers not to make a down payment or to take more cash from their home equity, which would automatically cause a prime loan to "flip" into a subprime loan. Another was to intentionally mislead underwriters by saying that the customer chose not to provide documentation in support of a loan application, did not have verified assets, or wanted to close the loan quickly. Loan officers used such techniques to increase their

commissions while discriminating against minority applicants.  These techniques were applied by loan officers responsible for Memphis and Shelby County.

79.     In 2004 Wells Fargo responded to public criticism by creating "filters" that were supposed to prevent the steering of prime customers into subprime loans.  It was widely understood that the filters were not effective.  Loan officers learned many ways to work around the filters by using the broad discretion they were afforded by Wells Fargo.  These techniques were widely used.  Senior managers were aware of their use and eventually made certain changes in response, but the loan officers continued to easily undermine the filters.  The filters were also ineffective because Wells Fargo did not create disincentives to steering prime customers into subprime loans.  To the contrary, employees continued to have substantial financial incentives to engage in such steering and continued to do so.

80.     Wells Fargo's steering practices and techniques were applied regularly in Memphis and Shelby County and caused many customers who qualified for prime or FHA loans to receive subprime loans.  Borrowers who were steered in this manner could be identified by reviewing Wells Fargo's loan files for loans in Memphis and Shelby County.

## C.     Other Abusive Subprime Lending Practices Engaged in by Wells Fargo

81.     The former Wells Fargo employees further confirm that Wells Fargo loan officers were given substantial discretion to increase the costliness of subprime loans and that they regularly used this discretion at the expense of subprime borrowers.

82.     The loan officers had broad discretion to set the pricing, points, and fees for subprime loans.  Even when Wells Fargo created some limits in 2007, loan officers

retained significant discretion.  Loan officers had strong financial incentives to increase the pricing, points, and fees because it would increase their commissions.

83.     The loan officers also used their discretion to discriminate against minority borrowers in Memphis and Shelby County by not offering them Wells Fargo's newer and better loan products.  Those products had lower fixed interest rates and fees then the products that were offered to minority borrowers.

84.     Wells Fargo loan officers also deceived subprime borrowers about the inclusion and significance of onerous prepayment penalties in the terms and conditions of their loans.  Prepayment penalties typically made it difficult for borrowers to refinance into new and better loans.  When the subject was raised, loan officers told borrowers that prepayment penalties could be waived, even though this was not true.

85.     Wells Fargo also qualified adjustable rate subprime loans in Memphis and Shelby County as if the borrower would be paying the teaser rate for the life of the loan instead of just the first two or three years.  This means that it was or should have been apparent to Wells Fargo from the outset that many of the people to whom it gave adjustable rate mortgages did not have the ability to repay those loans.  Foreclosures are a predictable result of this practice.

### 2.     Publicly Available Home Mortgage Disclosure Act Data Shows that Wells Fargo's High-Cost Loans are Disproportionately Located in African-American Neighborhoods in Memphis and Shelby County

86.     Publicly available data reported by Wells Fargo to federal regulators pursuant to the Home Mortgage Disclosure Act shows that from 2004 to 2008, Wells Fargo made high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark) to 51% of its African-American mortgage customers in Shelby County, but only 17% of its white customers in

the County.  In Memphis, it made high-cost loans to 63% of its African-American customers but only 26% of its white customers.

87.     Racial disparities in the pricing of Wells Fargo's mortgage loans are confirmed by a study released this year.  National People's Action, *The Truth About Wells Fargo: Racial Disparities in Lending Practices* (2009) at 2 (available at http://www.npa-us.org/downloads/truthaboutwellsfargo.pdf).  The study found that the disparity actually increased at higher income levels.  *Id.*

88.     The map that follows shows the geographic distribution of high-cost loans in African-American and white neighborhoods in Memphis and Shelby County.  The map demonstrates that Wells Fargo's high-cost loans are disproportionately located in Memphis' and Shelby County's African-American neighborhoods.  The fact that Wells Fargo's high-cost loans are more heavily concentrated in Memphis' and Shelby County's African-American neighborhoods is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rate of foreclosure in Memphis' and Shelby County's African-American communities.



**Wells Fargo Loan Originations 2004-2008**
**High Cost Purchase and Refinance Loans**
· 1 Dot = 1 Loan Originated, Not Actual Address

**Percent African American Households 2007**
Claritas Estimate By Census Block Group

20% or Less
20.1% - 40%
40.1% - 60%
60.1% - 80%
Over 80%
Insufficient Data

Source: HMDA 2004-2008; Claritas 2007

Indicates Majority
African-American
Neighborhood

Indicates Majority
White Neighborhood

89.     The stark disparity in the location of Wells Fargo's high-cost or subprime mortgage loans in Memphis and Shelby County is especially disturbing when one considers the location of Wells Fargo's low-cost or prime mortgage loans. Almost 70 percent of those loans are located in predominantly white neighborhoods, which encompass 38.3% of the County's households, while only 6.9% of the loans are in predominantly African-American neighborhoods, which encompass 30.2% of County households.  In other words, while Wells Fargo is targeting African-American neighborhoods for predatory subprime loans that disproportionately lead to foreclosure, it is also failing to allow residents of African-American neighborhoods to have access to prime loans.  Wells Fargo is simultaneously engaged in reverse redlining and redlining of minority neighborhoods, exacerbating the harm caused by each unlawful practice.  The following map demonstrates Wells Fargo's failure to make prime credit available in African-American neighborhoods.



**Wells Fargo Loan Originations 2004-2008**
**Low Cost Purchase and Refinance Loans**
· 1 Dot = 1 Loan Originated, Not Actual Address
**Percent African American Households 2007**
Claritas Estimate By Census Block Group
    20% or Less
    20.1% - 40%
    40.1% - 60%
    60.1% - 80%
    Over 80%
    Insufficient Data

Indicates Majority
African-American
Neighborhood

Indicates Majority
White Neighborhood

**3.      Wells Fargo's Pricing Sheets Show that it Targets Homes that are More Likely to be Located in African-American Neighborhoods for Interest Rate Increases, and Lowers Rates for Homes that are Disproportionately Located in White Neighborhoods**

90.      One reason that residents of Memphis' and Shelby County's African-American neighborhoods are more likely to pay higher prices for Wells Fargo loans than residents of Memphis' and Shelby County's white neighborhoods is the discriminatory pricing found on its pricing sheets.  As set forth explicitly on the Wells Fargo Home Mortgage 2005 pricing sheet, attached as Attachment B, Wells Fargo requires a 50 basis point <u>increase</u> in the loan rate for loans of $75,000 or less, a 12.5 basis point <u>decrease</u> for loans of $150,000 to $400,000, and a 25 basis point <u>decrease</u> for loans larger than $400,000.  This means that a borrower with a $75,000 thirty-year fixed rate loan who qualifies for an 8% interest rate instead receives an 8.5% interest rate, which costs an extra $9,493 over the life of the loan.  An equally creditworthy borrower with a $150,000 loan receives a 7.875% interest rate, which costs $4,698 less than an 8% loan.  A similarly qualified borrower with a $400,001 loan would receive a 7.75% interest rate, which costs $24,987 less than an 8% loan.

91.      The Fannie Mae Foundation has likewise documented how modest interest rate disparities can cause dramatic financial consequences for borrowers steered into higher-cost loans.  James H. Carr and Jenny Schuetz, Fannie Mae Foundation, *Financial Services in Distressed Communities: Framing the Issue, Finding Solutions* (2001) at 12-13 (available at http://www.cra-nc.org/financial.pdf) (1% increase in interest rate on 30-year $81,000 mortgage translates into loss of over $78,000 in wealth due to increased payments and lost investment opportunity).

92.      Wells Fargo's pricing rules have a clear and foreseeable disproportionate adverse impact on African-American borrowers.  As demonstrated by the maps that

follow, loans originated by Wells Fargo in the City from 2004 through 2008 in the amount of $75,000 and less were almost three times more likely to be in census tracts where the population is predominantly African-American than in tracts where the population is predominantly white.  By contrast, loans originated by Wells Fargo of more than $150,000 were ten times more likely in the City, and sixty-six times more likely in the County, to be in tracts that are predominantly white than in tracts that are predominantly African-American.



**Wells Fargo Loan Originations 2004-2008**
**Purchase and Refinance Loans of $75,000 or Less**

- 1 Dot = 1 Loan Originated, Not Actual Address

**Percent African American Households 2007**
Claritas Estimate By Census Block Group

- 20% or Less
- 20.1% - 40%
- 40.1% - 60%
- 60.1% - 80%
- Over 80%
- Insufficient Data

Indicates Majority African-American Neighborhood

Indicates Majority White Neighborhood



**Wells Fargo Loan Originations 2004-2008**
**Purchase and Refinance Loans**
**Over $150,000**

· 1 Dot = 1 Loan Originated, Not Actual Address

**Percent African American Households 2007**

Claritas Estimate By Census Block Group

- 20% or Less
- 20.1% - 40%
- 40.1% - 60%
- 60.1% - 80%
- Over 80%
- Insufficient Data

Indicates Majority African-American Neighborhood

Indicates Majority White Neighborhood

93.     Upon information and belief, the discriminatory pricing reflected in Wells Fargo's pricing sheets is consistent with unfair practices associated with reverse redlining and has contributed significantly to the disproportionately large number of foreclosures found in Memphis' and Shelby County's African-American communities.

>    **4.     Investigation of Wells Fargo's Pricing Practices in Philadelphia Further Demonstrates the Company is Targeting the African-American Community for Unfair and Improper Lending Practices**

94.     Discriminatory pricing observed in Wells Fargo's loan data in Memphis and Shelby County is consistent with findings drawn from data obtained in litigation brought against Wells Fargo in Philadelphia.  An expert report in a lawsuit based on Wells Fargo's Philadelphia loans concluded that "African American borrowers, and borrowers residing in African American neighborhoods (i.e., census tracts), pay more than comparable non-African Americans and residents of communities in which White people predominate."  Aff. of I. Goldstein, *Walker v. Wells Fargo Bank, N.A.*, No. 05-cv-6666 (E.D. Pa. July 20, 2007) at ¶ 7 (Docket No. 24, Attach. 1).

95.     Upon information and belief, Wells Fargo's pricing practices in Philadelphia are consistent with its practices in Memphis and Shelby County, and provide further evidence that the company is engaged in a pattern or practice of unfair lending that contributes significantly to the disproportionately high rate of foreclosure found in Memphis' and Shelby County's African-American neighborhoods.

>    **5.     Wells Fargo Underwrites Adjustable Rate Loans in Memphis' and Shelby County's African-American Neighborhoods that Borrowers Cannot Afford**

96.     Wells Fargo frequently originates "3/27" adjustable rate mortgages, and frequently originated "2/28" adjustable rate mortgages until mid-2007, to borrowers from predominantly African-American neighborhoods in Memphis and Shelby County.

Thirty-eight percent of Wells Fargo's foreclosures from 2000 to 2008 involved adjustable rate loans.  Unless properly underwritten, such loans are destined to fail.

97.     Wells Fargo does not properly underwrite these loans when made to African Americans and in African-American neighborhoods.  Wells Fargo does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default and foreclosure for many borrowers was, or should have been, clearly foreseeable to Wells Fargo at the time the loans were made.

98.     The use of "2/28" and "3/27" adjustable rate mortgages in the manner described above is consistent with the practice of reverse redlining, has subjected African-American borrowers to unfair and deceptive loan terms, and has contributed significantly to the high rate of foreclosure found in Memphis' and Shelby County's African-American neighborhoods.

**6.     The Caps on Wells Fargo's Adjustable Rate Loans are Higher in African-American Neighborhoods**

99.     Upon information and belief, Wells Fargo has discretion to apply different caps on adjustable rate loans.  The cap is the maximum rate that a borrower can be charged during the life of an adjustable rate loan.

100.     The average cap on a Wells Fargo adjustable rate loan that was subject to foreclosure from 2000 to 2008 in predominantly African-American neighborhoods in Memphis and Shelby County was 15.19%.  The cap on such loans in predominantly white neighborhoods in Memphis and Shelby County was only 13.9%.

101.     The disparity observed in caps imposed on adjustable rate loans in predominantly African-American neighborhoods and predominantly white neighborhoods further demonstrates that Well Fargo is engaged in a pattern or practice of

unfair and improper lending in Memphis' and Shelby County's African-American communities that contributes significantly to the high rate of foreclosure in these neighborhoods.

### 7. Wells Fargo's Loans to African Americans Result in Especially Quick Foreclosures

102.    A comparison of the time from origination to foreclosure of Wells Fargo's loans in Memphis and Shelby County shows a marked disparity with respect to the speed with which loans to African Americans and whites move into foreclosure.  The average time to foreclosure for borrowers in African-American neighborhoods in both the City and the County is 1.85 years.  It is 2.21 years for borrowers in white neighborhoods in the City, or 19% longer, and 2.48 years in white neighborhoods in the County, or 34% longer.

103.    This disparity in time to foreclosure is further evidence that Wells Fargo is engaged in lending practices consistent with reverse redlining.  As with all of the practices identified in paragraphs 67-85 above, and like the abusive practices identified in paragraph 34 above, the disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in African-American communities that does not serve the best interests of borrowers.  If Wells Fargo were applying the same underwriting practices in Memphis' and Shelby County's African-American and white neighborhoods, there would not be a significant difference in time to foreclosure.  Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American communities would not find themselves in financial straits significantly sooner during the life of their loans than borrowers in white communities.  The faster time to foreclosure in African-American neighborhoods is consistent with underwriting practices in the African-American

community that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

104.     The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices.  HUD and Treasury stated that "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination," and that "lenders should not lend to borrowers that do not have the capacity to repay the loans that the lender offers." HUD/Treasury Report at 25.

**INJURY TO MEMPHIS AND SHELBY COUNTY CAUSED BY
WELLS FARGO'S DISCRIMINATION IN MORTGAGE LENDING**

105.     Wells Fargo has engaged in a pattern or practice of reverse redlining that has resulted in a disproportionately high rate of foreclosure on loans to African Americans and in Memphis' and Shelby County's majority African-American neighborhoods.  Wells Fargo continues to engage in this discriminatory pattern or practice with similar and continuing deleterious consequences for Memphis' and Shelby County's African-American neighborhoods.

106.     The foreclosures caused by Defendants' discriminatory reverse redlining practices have caused, and continue to cause, multiple types of injuries to Memphis and Shelby County, including:

a.     A significant decline in the value of homes that are in close proximity to the Wells Fargo foreclosure properties, resulting in a decrease in property tax revenue;

b.      Increased expenditures for police and fire responses to Wells Fargo foreclosure properties that have become vacant and have turned into centers for squatting, drug use, drug distribution, prostitution, and other unlawful activities;

c.      Increased expenditures to secure, stabilize, clean, acquire, and rehabilitate Wells Fargo foreclosure properties that become vacant;

d.      Additional expenditures for administrative, legal, and social services in connection with notices of foreclosure at Wells Fargo properties.

107.    Wells Fargo foreclosure properties that become vacant result in injuries to Memphis and Shelby County that are especially costly.  Vacancies cause, among other harms, squatters, increased risk of crime and fire, and infrastructure damage such as burst water pipes and broken windows.  Expensive responses by Memphis and Shelby County are required to address these harms at Wells Fargo foreclosure properties.  The costs incurred by the City and County are the direct result of the foreclosures on Wells Fargo loans.

108.    Vacancies at Wells Fargo foreclosure properties and the problems associated with them likewise cause especially significant declines in property values because the neighborhoods become less desirable.  This reduces the property tax revenues collected by the City and County.

109.    Damages suffered by Memphis and Shelby County as a result of Wells Fargo's foreclosures are fully capable of empirical quantification.

110.    Memphis and Shelby County maintain detailed records that will allow for the precise calculation of the expenses they have incurred in addressing the harms caused by specific Wells Fargo foreclosures and consequent vacancies.  This includes, among

others, records regarding police and fire calls and housing code enforcement efforts (such as the costs of boarding vacant Wells Fargo properties).

111.    A recent study commissioned by the Homeownership Preservation Foundation demonstrates that, using such records, the costs of increased municipal services that are necessary because of foreclosures can be determined empirically. *See* William C. Apgar, Mark Duda & Rochelle Nawrocki Gorey, *The Municipal Cost of Foreclosures:  A Chicago Case Study* (Feb. 27, 2005) at 24-26 (available at http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/ 2005Apgar-DudaStudy-FullVersion.pdf).  The study isolated twenty-six types of costs incurred by fifteen government agencies in response to foreclosures in Chicago.  It then analyzed the amount of each cost based on different foreclosure scenarios, such as whether the home is left vacant, whether and to what degree criminal activity ensues, and whether the home must be demolished.  The study found that the total costs ran as high as $34,199 per foreclosure.

112.    Routinely maintained property tax and other data will likewise allow for the precise calculation of the property tax revenues lost by Memphis and Shelby County as a direct result of particular Wells Fargo foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City and County can isolate the lost property value attributable to each individual foreclosure or vacancy from losses attributable to other causes, such as neighborhood conditions.  This technique, known as hedonic regression when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-

49

maintained, and more.  Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

113.     The number of foreclosures in a neighborhood is one of the neighborhood traits that hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

114.     Foreclosures attributable to Wells Fargo in Memphis and Shelby County can be analyzed through hedonic regression to calculate the resulting loss in the property values of nearby homes, even if there are other foreclosures nearby that are not attributable to Wells Fargo.  The loss in property value in Memphis and Shelby County attributable to Wells Fargo's unlawful acts and consequent foreclosures can then be used to calculate Memphis' and Shelby County's corresponding loss in property tax revenues.

115.     Recent studies establish that hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile. *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure:  The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57 (2006) at 69.

116.     Other studies have focused on the impact of abandoned homes on surrounding property values.  A recent study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300

to 449 feet declined in value by $3,542.  Anne B. Shlay & Gordon Whitman, *Research for Democracy:  Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

117.    Application of methodologies like the ones employed by Apgar, Immergluck, and Shlay to data regularly maintained by Memphis and Shelby County can be used to quantify precisely the injury to the City and County caused by Defendants' discriminatory lending practices, including but not limited to those described above, and the Wells Fargo foreclosures that are the direct result of those practices.

118.    Defendants' actions set forth herein constitute a pattern or practice of discriminatory lending and a continuing violation of federal law.  Unless enjoined, Wells Fargo will continue to engage in the unlawful pattern or practice described above.

119.    Memphis and Shelby County have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents.

120.    The extent of Memphis' and Shelby County's injuries will increase unless and until Wells Fargo ceases to discriminate against African Americans and borrowers in majority African-American neighborhoods.

121.    Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Memphis' and Shelby County's federally protected rights.

## **CAUSE OF ACTION**
(Federal Fair Housing Act)

122.    Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 121 as if fully set forth herein.

123.    Defendants' acts, policies, and practices as documented above constitute intentional discrimination on the basis of race.  Defendants have intentionally targeted residents of predominantly African-American neighborhoods in Memphis and Shelby County for different treatment than residents of predominantly white neighborhoods in Memphis and Shelby County with respect to mortgage lending.  Defendants have intentionally targeted residents of these neighborhoods for subprime loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  Defendants have intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including but not limited to prepayment penalties.  Defendants have intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting subprime mortgage loans.

124.    Defendants' acts, policies, and practices have had an adverse and disproportionate impact on African Americans and residents of predominantly African-American neighborhoods in Memphis and Shelby County as compared to similarly situated whites and residents of predominantly white neighborhoods in Memphis and Shelby County.  This adverse and disproportionate impact is the direct result of Defendants' policies of giving substantial discretion to loan officers and others responsible for mortgage lending; giving loan officers and others responsible for mortgage lending large financial incentives to give borrowers loans that are costlier than loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer people into subprime loans without regard for whether they qualify for better loans, including but not limited to prime loans;

increasing the interest rate on loans of $75,000 or less and decreasing the interest rate on loans of $150,000 or more; and setting interest rate caps.  *See, e.g.*, *Miller v. Countrywide Bank, N.A.*, 571 F. Supp. 2d 251 (D. Mass. 2008).  These policies have caused African Americans and residents of predominantly African-American neighborhoods in Memphis and Shelby County to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Memphis and Shelby County, and that are materially more likely to result in foreclosure.

125.   Defendants' acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605:

(a)   Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

(b)   Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

(c)   Defendants' published policies and statements have expressed and continue to express a preference on the basis of race and/or color, in violation of 42 U.S.C. § 3604(c); and

(d)   Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race

and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

## DEMAND FOR JURY TRIAL

126.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant it the following relief:

(1)    Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(2)    Enter an injunction enjoining Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)    Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein;

(4)    Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6)     Order such other relief as this Court deems just and equitable.

December 30, 2009

                                        _____/s/ John P. Relman_____
                                        John P. Relman,
                                                Pending Admission *Pro Hac Vice*
                                        Bradley H. Blower
                                                Pending Admission *Pro Hac Vice*
                                        Glenn Schlactus
                                                Pending Admission *Pro Hac Vice*
                                        RELMAN & DANE, PLLC
                                        1225 19th Street NW, Suite 600
                                        Washington, DC 20036
                                        (202) 728-1888
                                        (202) 728-0848 (fax)
                                        jrelman@relmanlaw.com
                                        bblower@relmanlaw.com
                                        gschlactus@relmanlaw.com


                                        _____/s/ Steven E. Barlow_____
                                        Webb A. Brewer (BPR # 009030)
                                        Steven E. Barlow (BPR # 023498)
                                        Brewer & Barlow, PLC
                                        20 S. Dudley, Suite 806
                                        Memphis, TN 38103
                                        (901) 866-1442
                                        (901) 866-1630 (fax)
                                        webb@brewerbarlow.com
                                        steve@brewerbarlow.com

                                        *Attorneys for Plaintiffs*

Brian L. Kuhn (BPR # 008822)
Shelby County Attorney
Craig E. Willis (BPR # 022410)
Assistant County Attorney
160 N. Main Street, Suite 660
Memphis, TN 38103
(901) 545-4230
(901) 545-4687 (fax)
brian.kuhn@shelbycountytn.gov
craig.willis@shelbycountytn.gov

*Attorneys for Plaintiff Shelby County*

Herman Morris, Jr. (BPR # 005454)
City of Memphis Attorney
Patrick Dandridge (BPR # 017322)
Assistant City Attorney
125 N. Main Street, Room 336
Memphis, TN 38103
(901) 576-6614
(901) 576-6531 (fax)
herman.morris@memphistn.gov
patrick.dandridge@memphistn.gov

*Attorneys for Plaintiff City of Memphis*