## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

| | | |
|---|---|---|
| **CITY OF MEMPHIS and** | ) | |
| **SHELBY COUNTY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-2857-STA** |
| | ) | |
| **WELLS FARGO BANK, N.A.,** | ) | |
| **WELLS FARGO FINANCIAL** | ) | |
| **TENNESSEE, INC., and** | ) | |
| **WELLS FARGO FINANCIAL** | ) | |
| **TENNESSEE 1, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### ORDER DENYING DEFENDANTS' MOTION TO DISMISS
---

Before the Court is Defendants Wells Fargo Bank, N.A.; Wells Fargo Financial

Tennessee, Inc.; and Wells Fargo Financial Tennessee 1, LLC's (collectively "Defendants" or

"Wells Fargo") Motion to Dismiss the First Amended Complaint (D.E. # 38) filed on June 7,

2010.  Plaintiffs City of Memphis and Shelby County have a filed a response in opposition.  The

Court heard oral arguments on Defendants' Motion on April 1, 2011.  For the reasons set forth

below, Defendants' Motion is **DENIED**.

### BACKGROUND

Plaintiffs allege that Wells Fargo engaged in discriminatory lending practices in Memphis

and Shelby County in violation of the Fair Housing Act ("FHA") and the Tennessee Consumer

Protection Act ("TCPA").  Generally, the pleadings assert that Wells Fargo targeted African-

1

American mortgage borrowers from 2000 to 2009 by steering those borrowers into loans they could not afford.  The result was what Plaintiffs describe as a "disproportionately high number" of foreclosures in predominantly African-American neighborhoods in Memphis and Shelby County.

The Amended Complaint makes a series of statistical allegations about the overall foreclosure profile of Memphis and Shelby County, including the following:

• Wells Fargo made only 15% of its home loans in African-American neighborhoods, that is, neighborhoods with an African-American population of more than 80%. (Am. Compl. ¶ 4.)  Eighteen percent (18%) of Wells Fargo loans in African-American neighborhoods for this period resulted in foreclosure. (*Id*. ¶¶ 5, 60.)  However, 41% of Wells Fargo loans resulting in foreclosures occurred in African-American neighborhoods. (*Id*. ¶ 4.)

• In contrast, Wells Fargo made 59.5% of its loans in predominantly white neighborhoods, specifically, neighborhoods with an African-American population of less than 20%. (*Id*.)  Only 3% of loans made in predominantly white neighborhoods resulted in foreclosure.  (*Id*. ¶¶ 5, 60.)  Overall, 23.6% of Wells Fargo loans resulting in foreclosures occurred in predominantly white neighborhoods. (*Id*. ¶ 4.)

• From 2005 to 2008, 54.2% of Wells Fargo foreclosures occurred in predominantly African-America census tracts in the City of Memphis and 46.8% in African-American census tracts in Shelby County.  (*Id*. ¶ 57.)[1]

---

[1] Just as with "predominantly African-American neighborhoods," the Amended Complaint defines a "predominantly African-American census tract" as one with an African-American population of more than 80%. (Am. Compl. ¶ 54.)  The Amended Complaint further refers without elaboration to "African-American zip codes" and "white zip codes." (*Id*. ¶ 80.)  Although a "neighborhood" and a "census tract" and a "zip code" are distinct concepts, it is not

2

• For the same period, only 12.5% of Wells Fargo foreclosures occurred in predominantly white census tracts in the City and 20.1% in white census tracts in Shelby County. (*Id*.)[2]

• From 2004 to 2008, Wells Fargo made "high-cost loans" (loans with an interest rate that was at least 3% above a "federally-established benchmark") to 63% of its African-American borrowers in the City but only to 26% of its white borrowers in the City. (*Id*. ¶ 120.) In Shelby County, Wells Fargo made these high-cost loans to 51% of its African-American borrowers but to only 17% of its white borrowers. (*Id*.)

• Wells Fargo priced its basis points by increasing the rate 50 points for loans of $75,000 or less while decreasing the rate by 12.5 basis points for loans of $150,000 to $400,000 and decreasing by 25 points loans larger than $400,000. (*Id*. ¶ 124.) From 2004 to 2008, loans of less than $75,000 on properties in the City were three times more likely to be found in predominantly African-American census tracks. (*Id*. ¶ 126.)

• The average time to foreclosure for borrowers in African-American neighborhoods was 2.20 years in the City and 2.26 years in the County. For borrowers in white neighborhoods, the time was 2.79 years in the City, or 27% longer than in African-American neighborhoods. In the County the time is 2.76 years or 22% longer. (*Id*. ¶ 136.)[3]

In addition to statistics about foreclosures locally, the Amended Complaint details the national subprime lending crisis, the mortgage industry's departure from traditional prime

---

clear from the pleadings to what extent the three actually overlap.

[2] The Amended Complaint never clearly defines a "predominantly white census tract." In view of the pleadings as a whole, it is likely that a "predominantly white census tract" is a census tract where the population of African-Americans is less than 20%.

[3] The Amended Complaint does not specify what years these statistics cover.

lending, the origins of the crisis from the mid-1990s, and its disproportionate impact on African-American neighborhoods.  (*Id.* ¶¶ 29-48.)  Plaintiffs contend that Wells Fargo engaged in a specific practice known as "reverse redlining."  This is the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area in violation of the Fair Housing Act. (*Id.* ¶ 36.)  Plaintiffs further allege that reverse redlining was a significant problem in Memphis and Shelby County. (*Id.* ¶¶ 49-54.)  The Amended Complaint describes Wells Fargo as "a major contributor to the foreclosure crisis" in the Memphis area.  (*Id.* ¶¶ 55-60.)

Based on these allegations and statistics, the Amended Complaint alleges that the high number of foreclosures in Memphis-Shelby County resulted from Wells Fargo (a) employing predatory practices and pricing in African-American neighborhoods and customers; (b) failing to underwrite African-American borrowers properly; and (c) putting these borrowers into loans they could not afford. (*Id.* ¶¶ 7, 66.)  According to the Amended Complaint, Wells Fargo "generally fostered a discriminatory culture" among its lending agents.  Wells Fargo gave its employees broad discretion about steering customers to products more profitable for Wells Fargo.  For example, loan officers instructed borrowers not to submit documentation about income or put any money down, factors which would push their loans into the subprime category and result in higher interest rates and fees.  At the same time, loan officers failed to offer prime mortgages where borrowers could qualify for those products. (*Id.* ¶¶ 8, 123.)  Some Wells Fargo employees referred to loans of this type as "ghetto loans." Wells Fargo had software that was designed "to filter loans to make sure that applicants were offered the best loans for which they qualified, but the filters were regularly evaded and did not work." (¶ 98.)

4

Additionally, the Amended Complaint alleges that loan officers pushed other loan products which made home borrowers even more vulnerable to foreclosure. By failing to properly underwrite adjustable rate mortgages ("ARMs" or "2/28 and 3/27 loans") "when made to African-Americans and in African-American neighborhoods, . . . Wells Fargo d[id] not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expire[d] and the interest rate increase[d]." (*Id*. ¶ 131.) Wells Fargo also used higher interest rate caps in African-American neighborhoods (15.19%) than in white neighborhoods (13.9%). (*Id*. ¶¶ 133,134.) The Amended Complaint states that another Wells Fargo practice was to offer debt consolidation into one mortgage (credit cards, student loans, car loans, purchase money loans). (*Id*. ¶ 84.) Wells Fargo offered refinancing of existing mortgages "into new high-cost subprime loans." (*Id*. ¶ 85.) The Amended Complaint alleges that loans like these "could be identified by reviewing Wells Fargo's loan files for loans in Memphis and Shelby County." (*Id*. ¶ 110.)

Plaintiffs allege that Wells Fargo's violations of the Fair Housing Act have resulted in harm to the City of Memphis and Shelby County. Homes where the borrowers faced foreclosure tended to become vacant. (*Id*. ¶ 12.) When homes became vacant, local government incurred a series of expenses for police calls, fire calls, and boarding-up and cleaning properties. The Amended Complaint alleges that these costs "can also be distinguished from harm attributable to non-Wells Fargo foreclosures or other causes." (*Id*.) Another cost to Plaintiffs were the "significant declines" in property values and the reduction in property tax revenue collections that followed. (*Id*. ¶ 13.) Plaintiffs contend that these losses can be calculated precisely and distinguished from losses caused by other factors, using a method known as "hedonic regression." (*Id*. ¶¶ 200-203.)

The Amended Complaint then lists 50 different addresses where Plaintiffs had to provide additional government services following foreclosures. (*Id*. ¶¶ 139-212.)   All of these addresses were foreclosures related to loans originated by Wells Fargo and nearly all of them became vacant at some point after the foreclosure. (*Id*. ¶ 146.)  In many cases, local government had to make repairs to the properties to correct housing code violations.  (*Id*. ¶ 143.)  Plaintiffs allege that they have suffered injuries even where a foreclosure did not lead to a vacancy.

Wells Fargo's Motion to Dismiss (D.E. # 37) presents three arguments in favor of dismissal.  First, Wells Fargo contends that Plaintiffs have failed to plead that they have suffered an injury-in-fact that is fairly traceable to any illegal act committed by Wells Fargo.  As a result, Plaintiffs have not alleged sufficient facts to establish their standing to assert the claims at bar.  Second, Plaintiffs' FHA disparate impact claims must be dismissed because they have failed to make plausible factual allegations to support the claims.  Finally, Wells Fargo argues that based on the Supreme Court's reasoning in *Smith v. City of Jackson*, 544 U.S. 228 (2005), disparate impact claims are no longer cognizable under the FHA.

In their response brief, Plaintiffs have argued that the Amended Complaint plausibly alleges a traceable injury to Plaintiffs.  Wells Fargo's predatory lending in African-American neighborhoods caused increases in "notices of foreclosure and completed foreclosures."  In turn, these "foreclosures plausibly caused properties to become vacant."  The 50 particular foreclosures and vacancies listed in the Amended Complaint injured Plaintiffs financially causing the City and County to devote additional municipal services at those addresses and driving down property values.  Plaintiffs contend that these allegations both establish their standing and state a claim for violations of the FHA under a disparate impact theory.  As for Wells Fargo's theory

that FHA disparate impact claims are not cognizable after *City of Jackson*, Plaintiffs state that the

Court would have to conclude that the Sixth Circuit's decision in *Graoch Associates #33, L.P. v.*

*Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007),

was inconsistent with *City of Jackson*, even though *Graoch* was decided two years after *City of*

*Jackson*.  Therefore, Plaintiffs argue that Defendants' Motion to Dismiss should be denied.

## STANDARD OF REVIEW

Defendants challenge Plaintiffs' standing in this case pursuant to Federal Rule of Civil

Procedure 12(b)(1) as well as argue that Plaintiffs have failed to state a substantive claim under

Rule 12(b)(6).  Where a defendant challenges a plaintiff's standing to bring suit, the Court should

first consider whether it has subject matter jurisdiction pursuant to Rule 12(b)(1) before it

considers the substantive merits of a pleading pursuant to Rule 12(b)(6).[4]  Plaintiff has the

burden of proving jurisdiction in order to survive the Rule 12(b)(1) motion and must plead the

elements of standing with specificity.[5]  "A Rule 12(b)(1) motion can either attack the claim of

jurisdiction on its face or attack the factual basis for jurisdiction.[6]  Where there is a facial

challenge to standing, the Court must consider all of the allegations in the complaint as true.[7]

Where there is a factual challenge to standing, the Court may consider evidence outside the

---

[4] *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Coal Operators and Assoc., Inc., v. Babbitt*, 291 F.3d 912 (6th Cir. 2002).

[5] *Coal Operators*, 291 F.3d at 916; *Rogers v. Stratton Industries, Inc.,* 798 F.2d 913, 915 (6th Cir. 1986).

[6] *DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir. 2004).

[7] *Id*.

7

pleadings to resolve factual disputes and must weigh the evidence.[8]

As for the merits of Plaintiffs' pleadings, a defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pled allegations of the complaint as true and construe all of the allegations in the light most favorable to the non-moving party.[9]  As a general rule, "[t]o avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[10]  However, legal conclusions or unwarranted factual inferences need not be accepted as true.[11]  "[A] formulaic recitation of the elements of a cause of action will not do."[12]

Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[13] Although this standard does not require "detailed factual allegations," it does require more than

---

[8] *Id.*

[9] *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007).

[10] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 889, 902 (6th Cir. 2003).

[11] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[12] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[13] Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

"labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[14]  In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."[15]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[16]

## ANALYSIS

### I.    Standing

As an initial matter, Defendants have challenged Plaintiffs' standing to assert their claims under the FHA and the TCPA.  Standing is "the threshold question in every federal case."[17]  The Supreme Court has stated that the standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into "a vehicle for the vindication of the value interests of concerned bystanders."[18]  The party invoking federal subject matter jurisdiction bears the burden to demonstrate all of the elements of Article III standing including

---

[14] *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009);  *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.  *See also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

[15] *Iqbal*, 129 S.Ct. at 1949-50; *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

[16] *Iqbal,* 129 S.Ct. at 1949.

[17] *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

[18] *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *United States v. SCRAP,* 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

injury-in-fact.[19]

In this instance, Defendants' Motion is based on the allegations of Plaintiff's Amended Complaint as well as other facts outside of the pleadings. Wells Fargo argues that the City and County cannot show that the injuries alleged in the Amended Complaint were fairly traceable to any violation of the FHA committed by Wells Fargo.  According to Defendants, Memphis like other urban centers has suffered blight and decline for a variety of reasons, all of which predate the current housing crisis by decades.  Wells Fargo contends that most of the housing disparities in Memphis arise from racial, socio-economic, and educational inequalities, and yet Plaintiffs seek to hold Defendants responsible for these deeper and more widespread set of problems facing the City and County.

For example, while the Amended Complaint refers to 50 properties where Wells-Fargo-related foreclosures occurred, Wells Fargo cites the fact that Memphis and Shelby County had over 93,000 foreclosures from 2000 to 2009, and approximately 40,000 vacant properties.  Wells Fargo also argues that Plaintiffs' pleadings about foreclosures alone are misleading.  The Amended Complaint

> conflate[s] notices of foreclosures with completed foreclosures which defies common sense.  Many foreclosure notices do not result in foreclosures, and many completed foreclosures do not result in vacancies.  Foreclosure notices by themselves provide no basis to establish the necessary fairly traceable connection between Wells Fargo and [Plaintiffs'] purported damages.

> Defs.' Mot. 9, n. 4.

Next, Wells Fargo argues that Plaintiffs cannot show that they were "directly

---

[19] *Stalley v. Methodist Healthcare*, 517 F.3d 911 (6th Cir. 2006).

disadvantaged" by Wells Fargo's alleged violations of the FHA or that they suffered any "concrete harm."  According to Wells Fargo, in so far as Plaintiffs allege that residents received loans they could not afford, then Wells Fargo's actions actually led to a surplus of home buyers, resulting in increased demand for homes and rising property values.  As a result, Plaintiffs received tax revenue they would have otherwise not had, and homes were occupied that would have otherwise been vacant.

Wells Fargo emphasizes the similarity of allegations in the Amended Complaint in this case with the pleadings in other cases against mortgage lenders filed by the cities of Baltimore and Birmingham.  In the Baltimore and Birmingham suits, the courts dismissed similar allegations because the plaintiffs in those cases failed to plead injuries which were fairly traceable to the actions of the defendants.  In the Baltimore litigation, for example, the court there concluded that (1) the defendants were allegedly responsible for only a "negligible" portion of that city's vacant housing; and (2) the "alleged connection is even more implausible" when considered with other contributing factors.  The courts in the Baltimore and Birmingham cases also found that allegations of damages were too generalized to establish injury-in-fact.  In the case at bar, the Amended Complaint alleges that Plaintiffs can calculate their damages precisely with a method known as hedonic regression analysis.  Wells Fargo argues that this allegation is simply not plausible and that the Court should reject the claim just as the courts did in the Baltimore and Birmingham litigation.

Wells Fargo argues then that the Court need not conduct a property-specific analysis but "should conclude that any alleged injury may have been caused by a number of factors" because "the alleged injuries are far too tenuously connected and so not fairly traceable."  Therefore, the

Amended Complaint should be dismissed because Plaintiffs have failed to allege an injury-in-fact that is fairly traceable to any alleged violation of the FHA.  Wells Fargo then turns to the specific properties listed in the Amended Complaint and points out a series of supposed flaws in the allegations.  Of the 50 properties described, Wells Fargo argues that only 40 had loans originated by Wells Fargo and completed foreclosure proceedings initiated by Wells Fargo.  Without providing any citation to "the available data on these loans," Wells Fargo contends that 60% of the loans, that is, 30 properties, had a fixed rate mortgage.  Wells Fargo has asserted the following additional facts about the properties:

• Only 2 of the properties with adjustable-rate mortgages had an interest rate increase prior to foreclosure.

• Where data was available, the average interest rate on the 50 properties was 8.5% at origination and the average loan-to-value ratio was 87%.

• Only 30 of the homes are located in census tracts "that meet Plaintiffs' definition of predominantly African-American neighborhoods."  Of these 30 homes, Wells Fargo made 20 loans to borrowers "believed to be investors."  Of the other 10 properties, Wells Fargo argues that other factors "were the root causes of default" (citing "curtailment of income, medical problems, and structural problems at the property").

• Nearly 40% of the homes (20 properties) had at least one type of physical damage that predated the notice of foreclosure; nearly 83% had at least one damage that postdated the sale of the property to a third party following foreclosure.  For four homes, all of the alleged damages occurred in the calendar year following the sale of the property to a third-party; in three cases, the damages occurred two calendar years after a sale to a third-party.

• Of the 40 completed foreclosures, tax assessments increased on average over 10% between 2000 and 2009.

Furthermore, among the property-specific damages alleged in the Amended Complaint, Plaintiffs seek damages for expenses already recouped from "a Wells Fargo entity, a Wells Fargo mortgagor, or a subsequent purchaser."  For example, at 497 Marianna, all but $30 of alleged damages were paid in November 2007.

Based on these arguments, Wells Fargo contends that Plaintiffs have not shown an injury-in-fact that is fairly traceable to any acts of Wells Fargo.  Therefore, Plaintiffs lack standing and the Court should dismiss the case for lack of subject matter jurisdiction.

In response to Defendants' arguments about Plaintiffs' standing to bring these claims, Plaintiffs begin by briefing the proper standard of review.  Noting that Rule 12(b)(1) challenges may be either facial (limited to the pleadings) or factual (based on additional findings of fact), Plaintiffs point out that Wells Fargo's Motion to Dismiss is largely facial.  To the extent that Defendant have made additional factual assertions to attack the Court's subject matter jurisdiction, Plaintiffs argue that the Court should disregard these facts because they are untested. Even if the Court was inclined to consider the Motion to Dismiss as a "factual attack" on Plaintiffs' standing, Plaintiffs argue that the Court should still consider only the facial allegations of the pleadings.  A factual attack would require the Court to resolve factual disputes that involve one or more elements of Plaintiffs' prima facie case.  In other words, a factual attack would "also go to the merits of the case."  In this case, the standing issue turns on whether Plaintiffs can show they have suffered an injury-in-fact.  This question would necessarily include the issue of causation, i.e. whether the alleged violations of the FHA were causally connected to Plaintiffs'

injuries.

Plaintiffs argue that the Sixth Circuit has held that under circumstances like these, the Court should simply hold that "jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim" under the normal Rule 12(b)(6) standard.  Citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416 (6th Cir. 2006), Plaintiffs argue that the Sixth Circuit has provided two exceptions to this rule: "where the plaintiff's claim has no plausible foundation" or when the claim is foreclosed by Supreme Court precedent.  The first exception is a plausibility analysis identical to normal Rule 12(b)(6) *Twombly* standard of review.  The second exception is not applicable here because there is no Supreme Court precedent foreclosing FHA claims of the type Plaintiffs allege.  Therefore, whether the Court treats Wells Fargo's Rule 12(b)(1) motion as a facial attack or a factual attack, the Court will end up using the same standard of review, accepting all of the well-pled factual allegations as true and determining whether standing exists.

Turning to the facts of the Amended Complaint and accepting them as true, Plaintiffs argue that they have properly pleaded standing.  Plaintiffs emphasize that there are three "links" in their causal chain and contend that each link is well-pled.  The first link is Wells Fargo's alleged practice of reverse redlining, which is targeting African-American borrows "to pay more for their loans than they should or to receive loans that they cannot afford."  The result was "an increased likelihood of notices of foreclosure and completed foreclosures on the Wells Fargo loans in [] African-American neighborhoods."  The second link is the allegation that "[n]otices of foreclosure and completed foreclosures at the Wells Fargo properties cause borrowers to leave their homes, plausibly resulting in many of those properties becoming vacant when they would otherwise be occupied."  According to Plaintiffs, "discovery will show that" 47 of the 50

14

properties listed in the Amended Complaint actually became vacant.  The third link are the costs incurred by Plaintiffs related to foreclosures at specific addresses.  Those costs include (1) specific services (such as boarding, cleaning, and stabilizing structures, and fire and police services) at the foreclosed and vacant Wells Fargo properties; and (2) "lost property tax revenues as a result of the devaluation of properties in close proximity to Wells Fargo foreclosures." Plaintiffs argue that they would not have had to provide the services at the addresses but for the foreclosures and vacancies caused by Wells Fargo's predatory lending.

Based on these allegations, Plaintiffs argue that they have pled enough facts to establish their standing to bring this suit.  Plaintiffs contend that *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) controls the issue of standing and traceability of injury-in-fact in FHA claims.  In *Gladstone*, the Supreme Court held that a municipality had standing to bring FHA claims against two realty firms for steering black homebuyers away from the town.  The town's injury was simply loss of property value and property tax revenue.  Here Plaintiffs argue that they can demonstrate actual financial injuries for the cost of increased services at the properties listed in the pleadings.  Therefore, Plaintiffs have alleged even more than the municipality in *Gladstone*.

As for the traceability of Plaintiffs' injury, Plaintiffs again rely on *Gladstone*.  In that case, the Supreme Court accepted that the town's injuries (i.e. loss of property values and tax revenue) were fairly traceable to the illegal practice of steering minority home buyers away. With fewer buyers in the market, property values were likely to decline and if minority homeowners were concentrated in certain areas, white homeowners might move from those areas.  Plaintiffs also argue that traceability is not defeated just because third parties may play

some role in the causal chain.  For example, the Court should not consider Wells Fargo's untested assertions that other factors were likely to have caused the foreclosures.  Plaintiffs assert that "if Wells Fargo targeted the borrowers for predatory practices because of the racial composition of the property's neighborhood or the race of the borrower, it broke the law."

Plaintiffs specifically argue that the Sixth Circuit's decision in *City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, 615 F.3d 496 (6th Cir. July 27, 2010) is not applicable here.  The *City of Cleveland* case involved a public nuisance claim under Ohio common law against mortgage lenders that had engaged in subprime lending in that city.  The Sixth Circuit used a "directness inquiry" and held that pursuant to Rule 12(b)(6) the municipality had failed to state a claim because its alleged damages were too remote from the defendants' alleged misconduct.  The misconduct alleged in *City of Cleveland*, subprime lending and securitizing mortgages, were inherently legal activities.  Plaintiffs in the case at bar contend that "directness" is not required under the FHA.  Furthermore, Wells Fargo's alleged conduct is illegal under the FHA.  Therefore, *City of Cleveland* is distinguishable.  Finally, Plaintiffs emphasize the limited scope of damages they seek in this case and claim that Wells Fargo has overstated the types of injuries for which Plaintiffs seek damages.  Plaintiffs are not claiming that Wells Fargo is responsible for all of the crime and socioeconomic problems of the City of Memphis or Shelby County.  Therefore, Plaintiffs contend that they have pleaded enough facts to establish their standing in this case.

## A.    *Fair Housing Act*

The Court holds that Plaintiffs have carried their burden to establish standing in this case. It is undisputed in this case that the FHA permits a city or county government to bring suit.  The

statute itself provides a private right of action to any "aggrieved person"[20] and defines an "aggrieved person" to include any person who "claims to have been injured by a discriminatory housing practice."[21]  A "discriminatory housing practice" is "an act that is unlawful under section 3604, 3605, 3606, or 3617 of this title."[22]  Plaintiffs have alleged violations of 42 U.S.C. §§ 3604, 3605 of the FHA.  Furthermore, a city or municipality is a person for purposes of the FHA.[23]  Thus, Plaintiffs are not required to allege that they themselves were victims of the alleged housing discrimination.

In order to establish standing to bring an FHA claim and survive a motion to dismiss, the City of Memphis and Shelby County need only meet the minimal "core constitutional" standing requirements to present an Article III "case and controversy."[24]  Plaintiffs have the burden to allege that (1) they have suffered an injury; (2) the injury is fairly traceable to Wells Fargo's alleged violations of the FHA; and (3) the injury is likely to be redressed by the judicial relief sought.[25]  Put another way, a plaintiff may establish standing only by alleging "that as a result of

---

[20] 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or termination of an alleged discriminatory housing practice. . . to obtain appropriate relief with respect to such discriminatory housing practice. . . .").

[21] § 3602(i).

[22] § 3602(f).

[23] *See United States v. City of Parma, Ohio*, 661 F.2d 562 (6th Cir. 1981).

[24] *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366-67, 34 L.Ed.2d 415 (1972); *DeBolt v. Espy*, 47 F.3d 777, 779-80 (6th Cir. 1995); *Smith v. City of Cleveland Heights*, 760 F.2d 720, 721 (6th Cir. 1985).

[25] *Allen v. Wright,* 104 S.C. at 3325 (quoting *Valley Forge Christian Coll.*, 454 U.S. 464, 472, 102 S.Ct. 752).

the defendant's [discriminatory conduct] he has suffered a distinct and palpable injury."[26]

Moreover, not all injuries arising from violations of the FHA create standing but only those

"fairly traceable" to a defendant's conduct.  The Supreme Court has explained that "there must

be a causal connection between the injury and the conduct complained of."[27]  "The causation

requirement of the constitutional standing doctrine exists to eliminate those cases in which a

third party and not a party before the court causes the injury."[28]  In *Gladstone*, the United States

Supreme Court has held that anyone including a municipality may sue for violations of the FHA

so long as the plaintiff is "genuinely injured by conduct that violates someone's. . . rights."[29]  The

*Gladstone* Court concluded that a municipality could demonstrate injuries fairly traceable to a

realty firm's violations of the FHA where the injuries to the municipality included a racially

segregated community, a decline in property values, and diminished tax receipts.[30]  Therefore, the

municipality in *Gladstone* had standing to sue for violations of the FHA.[31]

---

[26] *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

[27] *Id.* (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)).

[28] *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Com'n*, 389 F.3d 536, 542 (6th Cir. 2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136 (1992)).

[29] *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n.9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).  *See also Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 774 F.2d 135, 138 (6th Cir. 1985).

[30] *Gladstone*, 441 U.S. at 110-11, 99 S.Ct. 1601.

[31] *Id.* at 110 ("If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct.").  In addition to Article III's standing requirements, a plaintiff must typically

The Court holds that the Amended Complaint contains allegations sufficient to survive Defendants' Motion to Dismiss for lack of standing. Defendants largely attack the second element of Plaintiffs' standing, whether Plaintiffs have alleged any injury fairly traceable to the conduct of Defendants. The Court finds that Defendants' arguments fail for two reasons.

First, Plaintiffs have plausibly alleged a causal connection between their injuries and the conduct of Defendants. Bearing in mind the liberal standing requirement for municipalities set out in *Gladstone*, the Court concludes that at the pleadings stage, Plaintiffs have standing to pursue their limited claims for damages. Plaintiffs have alleged well-pled claims for two types of damages where Wells Fargo loans resulted in foreclosure and vacancy: (1) the cost of increased government services; and (2) the loss of property tax revenue. In support of their allegations, Plaintiffs have identified fifty properties representing a larger number of addresses affected by Defendants' lending practices. By focusing on these addresses and others like them where allegedly predatory Wells Fargo loans actually resulted in foreclosures and vacancies, the Court finds that Plaintiffs have narrowed the potential damages in this suit considerably. Furthermore, the Amended Complaint plausibly alleges that Plaintiffs' limited damages are fairly traceable to Defendants' illegal conduct. The City of Memphis and Shelby County have not alleged that Wells Fargo lending practices resulted in a host of social and political ills plaguing entire sections of the community. Rather Plaintiffs contend that Defendants have targeted individual

---

satisfy prudential concerns about the exercise of federal jurisdiction in a given case. *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.*, 210 F. App'x 469, 471-72 (6th Cir. 2006) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). In the FHA context, however, "Congress has made a decision to afford standing to all litigants within the constitutional limits." *Id*. (citing *Havens*, 455 U.S. at 372, 102 S.Ct. 1114, and *Gladstone*, 441 U.S. at 103 n.9, 99 S.Ct. 1601).

property owners with specific lending practices (reverse-redlining), resulting in specific effects (foreclosures and vacancies) at specific properties, which in turn created specific costs (services and tax revenue) for local government.  These concrete allegations distinguish Plaintiffs' claims from those alleged by the City of Birmingham (and the City of Baltimore in its initial pleadings) in similar FHA suits.  Applying *Gladstone* and its progeny to the pleadings in this case, the Court concludes that Plaintiffs have alleged their standing to recover for injuries traceable to the acts of Defendants.

Additionally, the Court finds a second alternative basis for rejecting Defendants' standing argument at this stage of this case.  The Sixth Circuit has held that "[w]hen the basis of federal jurisdiction is intertwined with the plaintiff's federal cause of action, the court should assume jurisdiction over the case and decide the case on the merits."[32]  Subject matter jurisdiction and the merits of a claim are typically considered intertwined where the same statute gives rise to both federal subject matter jurisdiction and the cause of action itself.[33]  The rule prevails unless a federal claim has "no plausible foundation" or "is clearly foreclosed by a prior Supreme Court

---

[32] *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 444 (6th Cir. 2006) (citing *Bell v. Hood,* 327 U.S. at 681-82, 66 S.Ct. 773).  *See also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 1244 (2006) ("[I]f subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own.. . .  If satisfaction of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts.") (citations omitted); *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) ("This provides a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) or Rule 56, both of which place greater restrictions on the district court's discretion.") (quotations and citation omitted).

[33] *Moore*, 458 F.3d at 444 (citing *Clark v. Tarrant Cnty., Texas,* 798 F.2d 736, 742 (5th Cir. 1986)).

decision."[34]  Here, in addition to their facial challenge to Plaintiffs' standing, Defendants have

presented a factual challenge, asserting facts about the fifty properties listed in the Amended

Complaint which might defeat Plaintiffs' standing.  In so far as Plaintiffs' claims under the FHA

provide this Court with federal subject matter jurisdiction as well as the Plaintiffs' federal cause

of action, the Court need not consider Defendants' factual attacks.  Defendants' argument that

Plaintiffs have not pled an injury fairly traceable to Defendants' conduct goes to the merits of

Plaintiffs' FHA claims, that is, whether there is a causal connection between Defendants'

allegedly predatory lending and housing vacancies in Memphis-Shelby County.  The *City of

Cleveland* case is distinguishable in this respect due to the fact that Cleveland's claims were

based on state law and the federal court's jurisdiction on the diversity of the parties.[35]  Under the

circumstances, the Court holds that the proper course is to assume jurisdiction over this case and

proceed to consider whether Plaintiffs have stated a plausible claim for relief.

**B.      *Tennessee Consumer Protection Act***

Likewise, the Court holds that Plaintiffs have standing to assert claims under the

Tennessee Consumer Protection Act.  The TCPA prohibits "[u]nfair or deceptive acts or

---

[34] *Id*. (citations and quotation omitted).

[35] *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 498-99 (6th Cir.  2010) ("In this diversity case, the city of Cleveland, Ohio ('Cleveland'), brings a public nuisance suit against twenty-two financial entities ('Defendants') that it claims are responsible for a large portion of the subprime lending market in Cleveland and nationally."). *Cf. In re Foreclosure Cases*, Nos. 07-cv-166 et al., 2007 WL 4589765, at * 3 (S. D. Ohio Dec. 27, 2007) ("As the Sixth Circuit recognized in *Moore,* standing and the merits most frequently merge only when the same federal statute creates both a cause of action and federal question jurisdiction. That is not the case here. Plaintiffs' cause of action is created by state law, not a federal statute, and jurisdiction is based on diversity, not a federal question.").

practices affecting the conduct of any trade or commerce."[36]  The Tennessee Supreme Court has

held that the TCPA should "be liberally construed" to affect its remedial purposes.[37]  The Act

defines "trade," "commerce," or "consumer transaction" as the "advertising, offering for sale,

lease or rental, or distribution of any goods, services, or property, tangible or intangible, *real*,

personal or mixed, and other articles, commodities, or things of value wherever situated."[38]

Courts construing Tennessee law have consistently held that the TCPA applies to mortgage

transactions.[39]  With respect to standing, the TCPA provides that "[a]ny person who suffers an

ascertainable loss of money or property. . . as a result of the use or employment by another person

of an unfair or deceptive act or practice" under the Act may sue to recover for actual damages.[40]

Under the Act a "person" includes a governmental agency or a corporation.[41]

　　　　Based on a liberal construction of the statute, the Court holds that Plaintiffs have

standing to bring their TCPA claims.  The language of the Act itself grants standing to any

"person" to recover damages caused by a deceptive act.  The Court finds that like the FHA, the

TCPA does not require that a plaintiff actually suffer the unfair or deceptive act, only that the

plaintiff suffer damages as a result of the unfair act.  Defendants argue that Plaintiffs have not

---

[36] Tenn. Code Ann. § 47-18-104(a).

[37] *Pursell v. First Am. Nat'l Bank,* 937 S.W.2d 838, 841 (Tenn. 1996).

[38] § 47-18-103(19) (emphasis added).

[39] *E.g. Laporte v. Wells Fargo Bank, N.A.*, No. 08-cv-376, 2009 WL 2146324, at *3 (E.D. Tenn. July 14, 2009).

[40] Tenn. Code Ann. § 47-18-109(a)(1).

[41] § 47-18-103(13).

alleged that their injuries were actually traceable to any conduct attributed to Defendants.[42]  The Court has already concluded that Plaintiffs have alleged an injury traceable to Wells Fargo's discriminatory lending practices.  Consistent with that ruling, the Court holds that Plaintiffs have also alleged their standing to pursue their TCPA claims.

Having held that Plaintiffs have standing at the pleadings stage, Defendants' Motion to Dismiss for lack of standing is **DENIED**.  The Court is mindful that the elements of "standing are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."[43]  As a result, the Court emphasizes that its holding on Plaintiffs' standing at the pleadings stage does not in any way preclude Defendants from presenting a factual record and revisiting Plaintiffs' standing at a subsequent stage of the case.

## II.    Failure to State a Disparate Impact Claim Under the FHA

Defendants have argued that even if Plaintiffs have standing in this case, Plaintiffs have failed to state a claim upon which relief may be granted.  More specifically, Wells Fargo argues that Plaintiffs have failed to plead the elements of an FHA disparate impact claim under Rule

---

[42] Defendants have also argued in passing that Plaintiffs must satisfy prudential limitations on standing to bring their TCPA claims.  Defs.' Memo. 12-13 n.19.  Defendants have cited no authority for this proposition and otherwise fail to elaborate on it.  Therefore, the Court finds that it need not reach this argument.

[43] *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

12(b)(6).  According to Defendants, in order to plead such a claim, Plaintiffs must allege: (1) a specific and clearly delineated practice or policy adopted by Wells Fargo in violation of the FHA; (2) a disparate impact on a protected group; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact.  The Amended Complaint alleges that Wells Fargo employed an illegal practice known as reverse redlining.  Although Plaintiffs allege that Wells Fargo's reverse redlining practices had a disparate impact on African-Americans, Defendants assert that the Amended Complaint fails to include any statistical allegations about Wells Fargo's underwriting and its impact on African-Americans.  The studies and expert testimony cited in the pleadings do not address Memphis or Shelby County specifically nor does the data reflect the population of the Memphis area.  Wells Fargo argues that Plaintiffs have cherry-picked data by referring to "African-American neighborhoods" rather than simply identifying African-Americans who were victims of reverse redlining.  The Amended Complaint further fails to compare African-American and white borrowers with data to account for objective factors such as creditworthiness, credit scores, and other factors relevant for credit risk.  To the extent that the Amended Complaint employs "information and belief" pleadings, Wells Fargo argues that these are insufficient to state a claim.

Wells Fargo also contends that Plaintiffs have failed to allege a causal connection between reverse redlining and any disparate impact on African-American borrowers.  Wells Fargo suggests that any connection is "too attenuated" and would ignore the impact of socio-economic disparities between blacks and whites in Memphis and Shelby County.  For example, Wells Fargo cites the median income and unemployment rates of Whitehaven, a predominantly African-American neighborhood, and Germantown, a predominantly white area.  According to

24

Wells Fargo, Whitehaven, an area with many foreclosures, has an unemployment rate of 10.87% and a median income of $32,319.  In contrast, Germantown, an area with comparatively few foreclosures, has an unemployment rate of 1.8% and a median income of $98,204.  In light of such facts,[44] any allegation that Wells Fargo's alleged reverse redlining was causally connected to the disproportionate rate of foreclosure among African-Americans is too speculative and implausible.

Finally, Wells Fargo argues that the Court should dismiss Plaintiffs' FHA claims because the FHA does not permit disparate impact claims.  Wells Fargo posits that the FHA's enforcement provision mirrors Title VII § 703(a)(1) and ADEA § 4(a)(1).  The Supreme Court in *Smith v. City of Jackson*, 544 U.S. 228 (2005), held that the enforcement provisions in these other civil rights laws permitted disparate treatment but not disparate impact claims.  Because the FHA contains an enforcement provision identical to these other civil rights laws, Wells Fargo argues that the FHA should be construed in the same way to not permit disparate impact claims.  In *Graoch Assocs. #33, L.P. v.  Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007), the Sixth Circuit stated that FHA disparate impact claims were "viable" but never addressed the applicability of the holding in *City of Jackson*.  Thus, Wells Fargo argues that *Graoch* is distinguishable and does not control.

In response to these arguments about the merits of their pleadings, Plaintiffs address the elements of their FHA disparate impact claims.  First, Plaintiffs contend that the Amended Complaint plausibly alleges that Wells Fargo's practices have a disparate impact on African-

---

[44] Wells Fargo has not cited any authority that would permit the Court to consider these facts outside of the pleadings on a Rule 12(b)(6) motion.

Americans living in Memphis and Shelby County.  Wells Fargo's reverse redlining "result[s] in higher-cost loans, a higher rate of foreclosure, a higher concentration of foreclosures, and a shorter average length of time to foreclosure for Wells Fargo's African-American borrowers from predominantly African-American neighborhoods." According to Plaintiffs, the Court should disregard Wells Fargo's argument that Plaintiffs have failed to plead sufficient statistics.  Such a contention is not appropriate on a Rule 12 motion.

Plaintiffs' next argue that they need not show that the disparate impact of Wells Fargo's FHA violations fell only on members of a protected class.  "Unfair practices principally affecting neighborhoods that are mostly African-American demonstrate a sufficient disparity to state a disparate impact claim." Plaintiffs maintain that they have adequately pled causation despite Wells Fargo's argument that the statistical disparities in credit terms and foreclosure rates are based on objective criteria such as credit scores and other underwriting factors.  Plaintiffs argue in rebuttal  that other lenders did not have as many foreclosures as Wells Fargo in this area.  The Amended Complaint includes allegations based on sworn statements from former Wells Fargo employees that Defendants targeted African-Americans.  "The declarations state that Wells Fargo steered people who had good credit scores and qualified for prime loans into subprime loans, and gave loans to many people with poor credit scores who did not qualify for any loan."

With respect to Defendants' argument that *City of Jackson* could apply to preclude FHA disparate impact claims, Plaintiffs point out that two years after *City of Jackson*, the Sixth Circuit in *Graoch* discussed the elements of an FHA disparate impact claim.  Plaintiffs further contend that since *City of Jackson*, multiple courts have rejected the same argument Wells Fargo makes

here.  Therefore, this Court should reject Defendants' position too.

It is well-settled in this Circuit that disparate impact claims are cognizable under the FHA.[45]  The Sixth Circuit has adopted the *McDonnell-Douglas* burden-shifting framework for analyzing disparate impact claims against private defendants under the FHA.  First, a plaintiff must make a *prima facie* case of discrimination by "identifying and challenging a specific [housing] practice, and then show[ing] an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question."[46]  After a plaintiff has established a *prima facie* case, the burden shifts to the defendant to offer a "legitimate business reason" for the challenged practice.[47]  Finally, if the defendant meets its burden, the plaintiff must demonstrate that the defendant's reason is "a pretext for discrimination, or that there exists an alternative [housing] practice that would achieve the same business ends with a less discriminatory impact."[48]

As previously noted, pleadings generally must "contain either direct or inferential allegations with respect to all material elements of the claim" in order to survive a Rule 12(b)(6)

---

[45] *See Arthur v. Toledo,* 782 F.2d 565, 574-75 (6th Cir. 1986).  The Court finds no support for Defendants' argument that a disparate impact claim for violation of the FHA is no longer available in light of *City of Jackson*.  As discussed below, the Sixth Circuit announced the standard for proving disparate impact under the FHA in a case decided two years after *City of Jackson*.

[46] *Graoch Associates # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Com'n*, 508 F.3d 366, 374 (6th Cir. 2007) (citation omitted).

[47] *Id*. (citation omitted).

[48] *Id*. (citation omitted).

motion.[49]  Nevertheless, the Sixth Circuit has held that a complaint for housing discrimination need not include specific facts establishing a *prima facie* case of discrimination under the *McDonnell Douglas* framework in order to survive a motion to dismiss.[50]  The Supreme Court has explained, "Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required *prima facie* case in a particular case.  Given that the *prima facie* case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases."[51]  Accordingly, a complaint for housing discrimination may survive a motion to dismiss by "giv[ing] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[52]  The Sixth Circuit in *Lindsay* concluded that the plaintiffs in that case had stated a Fair Housing Act claim simply by alleging the statutory basis for the claim and the factual predicates of the claim.[53]

Accepting the well-pled allegations as true and applying the relevant pleadings standard for FHA claims to the Amended Complaint in this case, the Court holds that Plaintiffs have stated a claim for disparate impact in violation of the FHA.  First, Plaintiffs have identified the

---

[49] *Wittstock*, 330 F.3d at 902.

[50] *Lindsay v. Yates*, 498 F.3d 434, 439 (6th Cir. 2007). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (reasoning in the context of employment discrimination that *McDonnell Douglas* is an evidentiary standard, not a pleading requirement). The Sixth Circuit in *Lindsay* expressly concluded that *Swierkiewicz* remained good law even after the Supreme Court's subsequent decisions in *Twombly* and *Iqbal*.  *Lindsay*, 498 F.3d at 440 n.6.

[51] *Swierkiewicz*, 534 U.S. at 510-12, 122 S.Ct. 992.

[52] *Lindsay*, 498 F.3d at 439.

[53] *Id.* at 440.

statutory basis for their claims, 42 U.S.C. §§ 3604, 3605 of the FHA.  Section 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" some protected characteristic including race.[54]  Section 3605 makes it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race. . ."[55]

Second, Plaintiffs have set forth the factual predicates of their claims in the Amended Complaint.  Plaintiffs have alleged that Defendants violated these sections of the FHA by intentionally targeting borrowers in predominantly African-American areas for predatory loans, a practice known as reverse redlining.[56]  The Amended Complaint states that Wells Fargo offered

---

[54] 42 U.S.C. § 3604(b).  One district court in this Circuit has held that relief under § 3604 is not available where the alleged violation of the FHA involves a home mortgage.  *Eva v. Midwest National Mortg. Bank, Inc.*, 143 F. Supp. 2d. 862, 882 (N.D. Ohio 2001) (reasoning that the general relief of § 3604 is not available because mortgage transactions are specifically protected by § 3605).  The Sixth Circuit has not resolved the exact question.  *But see Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1357 (6th Cir. 1995) ("We agree with the conclusion in *American Family* that §§ 3604 and 3605 overlap and are not mutually exclusive.").  Because Defendants have not raise this issue in the Motion to Dismiss, the Court need not reach it here.

[55] 42 U.S.C. § 3605(a).  That section goes on to define a "residential real estate-related transaction" to include "the making or purchasing of loans or providing other financial assistance (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate." § 3506(b)(1)(A) & (B).

[56] At the motion hearing, counsel for Plaintiffs asserted that the Amended Complaint alleges disparate treatment under the FHA in the form of reverse redlining.  Defendants did not challenge that assertion.  Many courts have held that the practice of reverse redlining is a violation of the FHA and will support a claim for disparate treatment.  *See Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 368-69 (11th Cir. 2009) (citing *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000)); *Mayor and City Council of Baltimore v. Wells*

borrowers in African-American neighborhoods subprime mortgages with excessive interest, points, and fees when those borrowers actually qualified for prime loans.  In other cases, the borrowers were given loans they could not afford when they should not have received a loan at all.  During the approval process, loan officers would instruct these customers to state their income on the loan application without providing actual proof of income.  According to the Amended Complaint, this practice kept qualified borrowers from receiving a loan on the most favorable terms.  Loan officers would also offer customers lines of credit or credit cards that were secured by the customers' homes without properly underwriting the borrowers to ensure creditworthiness.  Wells Fargo employees targeted African-Americans by obtaining lists of customers who made purchases on credit at businesses in African-American neighborhoods. Plaintiffs allege that these and other intentional practices all violated the FHA.

The pleadings also allege that Defendants adopted certain facially-neutral policies that had a disparate impact on African-Americans in Memphis and Shelby County in violation of §§ 3604 and 3605 of the FHA.  For example, Wells Fargo gave local loan officers wide discretion in how they originated loans while also creating large incentives for officers to originate as many

---

*Fargo Bank, N.A.*, No. JFM-08-62, 2011 WL 1557759 (D. Md. Apr. 22, 2011); *Woodworth v. Bank of America Nat'l Ass'n*, No. 09-3058-CL, 2011 WL 1540358, at *18 (Mar. 23, 2011);  *Diaz v. Bank of America Home Loan Servicing*, No. CV 09-9286, 2010 WL 5313417, at *4 (C.D. Cal. Dec. 16, 2010); *M & T Mortg. Corp. v. White*, Nos. 04-CV-4775, 04-CV-5620, 2010 WL 3420480, at *26 (E.D.N.Y. Aug. 26, 2010); *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 875-76 (N.D. Cal. 2010); *Williams v. 2000 Homes Inc.*, No. 09-CV-16, 2009 WL 2252528, at *5 (E.D.N.Y.  July 29, 2009); *Hafiz v. Greenpoint Mortg. Funding, Inc.*, 652 F. Supp. 2d 1039, 1045-46 (N.D. Cal. 2009);  *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 886-87 (S.D. Ohio 2002); *Eva*, 143 F. Supp. 2d. at 882; *Honorable v. Easy Life Real Estate Sys.*, 100 F. Supp. 2d 885, 892 (N.D. Ill. 2000).  Because Defendants have not argued that the Amended Complaint fails to state a disparate treatment claim, the Court does not address the issue here.

subprime loans as possible because subprime loans were more profitable for Wells Fargo.  As a result, officers steered borrowers to subprime loans and other loan products without regard to whether the customer qualified for a better loan, routinely evading internal controls to game the loan process.  The Amended Complaint includes statistical allegations in support of these assertions.[57]  For example, Defendants made high-cost loans (loans with an interest rate of 3% or more than the federal benchmark) to 63% of African-American borrowers in the City and to only 26% of white borrowers in the City.  In Shelby County, Defendants made these loans to 51% of its African-American customers and to only 17% of its white customers.  Plaintiffs further allege that Defendants priced loans based on the value of the mortgaged property, increasing the interest rate on homes valued at $75,000 or less, properties which were three times more likely to be situated in predominantly African-Americans areas of Memphis and Shelby County.  At the same time, Wells Fargo discounted interest rates on homes valued between $150,000 and $400,000, and gave even better discounts on mortgages in excess of $400,000.  The predictable result of these lending patterns was a greater number of foreclosures in the African-American community.  With respect to foreclosures, 41% of Wells Fargo mortgages resulting in foreclosure were in predominantly African-American neighborhoods even though such mortgages accounted for only 15% of Wells Fargo mortgage business.  In contrast, Wells Fargo made 59.5% of its loans in

---

[57] The Sixth Circuit has held that disparate impact may be shown in one of two ways:  (1) that a policy had a greater adverse impact on one group than on other groups; or (2) the effect the policy has on the community, i.e. the policy perpetuates segregation and thereby prevents interracial association. *Graoch*, 508 F.3d at 378 (citing *Arthur*, 782 F.2d at 575).  In order to make the first kind of showing,  "[t]he correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Id.* (citing *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 987 (4th Cir. 1984)).

predominantly white neighborhoods, and yet only 23.6% of those loans ended in foreclosure. The Court finds that these statistical allegations are sufficient to illustrate that Wells Fargo's policies had a disproportionate impact on the minorities in the total group to which the policies were applied.

Based on these allegations, the Court holds that Plaintiffs have pled sufficient facts to survive Defendants' Motion to Dismiss.  Plaintiffs have given Defendants notice of the statutory basis of their claims under the FHA and the factual predicates supporting the claims.  Plaintiffs have satisfied the notice pleading standard set out in *Lindsay*.   Therefore, Defendants' Motion to Dismiss for failure to state a claim is **DENIED**.

## CONCLUSION

The Court holds that Plaintiffs have alleged sufficient facts to establish standing to pursue claims for violations of the Fair Housing Act and the Tennessee Consumer Protection Act. Additionally, Plaintiffs have adequately pled their claim that Wells Fargo's lending practices had a disparate impact on African-Americans in Memphis and Shelby County in violation of the FHA.  Therefore, Defendants' Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: May 4, 2011.